UNITED STATES of America, Appellee,

v.

Vincent F. CHIARELLA,
Defendant-Appellant.

No. 137, Docket 78–1201.

United States Court of Appeals,
Second Circuit.

Argued Oct. 3, 1978.

Decided Nov. 29, 1978.

See also, D.C., 450 F.Supp. 95.

1360

Stanley S. Arkin, New York City (Arkin, Arisohn & Cross, P. C., Mark S. Arisohn, Lee Cross, New York City, of counsel), for defendant-appellant.

John S. Siffert, Asst. U. S. Atty., Southern District of New York, New York City (Robert B. Fiske, Jr., U. S. Atty., Richard D. Weinberg, Asst. U. S. Atty., New York City, of counsel), for appellee.

Before KAUFMAN, Chief Judge, and SMITH and MESKILL, Circuit Judges.

IRVING R. KAUFMAN, Chief Judge:

The draftsmen of our nation's securities laws, rejecting the philosophy of *caveat emptor,* created a system providing equal access to the information necessary for reasoned and intelligent investment decisions. It is apodictic that betting on a "sure thing" is anathema to the ideal of "fair and honest markets" established as the foundation of this statutory edifice.[1] The present case requires us to apply these principles in the context of a criminal prosecution for trading on advance knowledge of stock market events. Vincent Chiarella used confidential information obtained through his job in a financial printing house to anticipate impending tender offers. He bought cheap and, soon after, sold dear. For these activities, he stands convicted of willfully violating § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5. On appeal, he contends that his operations, however nefarious, do not fit the statutory definition of criminal conduct and, moreover, that the trial judge erred in instructing the jury on the crucial issue of intent. He also challenges numerous other aspects of Judge Owen's charge and a host of his rulings on evidentiary matters. We affirm.

I.

Hostile tender offers are the high drama of Wall Street, but they have their tedious aspects. Chief among the latter is the vast amount of paper they generate even before the offer is made. Offering and transmittal letters, newspaper announcements, and disclosure statements to be filed in Washington must be prepared before the offeror may invite tenders. These documents are

1. Securities Exchange Act of 1934 § 2, 15 U.S.C. § 78b.

produced by the specialized printing firms that cluster around our centers of finance.

Appellant was a "markup man" in the composing room of one such establishment, Pandick Press. Located in downtown Manhattan, Pandick was readily accessible to law firms and banking houses. When copy from a customer arrived in the shop, it went first to Chiarella. He selected type fonts and page layouts and then passed the manuscript on to be set into type.

Between September 1975 and November 1976, in addition to preparing more mundane documents such as annual reports and proxy statements, Chiarella handled the raw material for five separate takeover bids.[2] To preserve confidentiality for as long as possible—and, most particularly, to avoid an anticipatory rise in the market price of the target company's stock should news of the impending tender offer become public—the type was initially set with certain vital information absent or in code. Thus, when Emhart Corp. sought to purchase control of USM Corp., the documents originally delivered to Pandick read "Arabia Corp." and "USA Corp." Not until the final press run on the night before release were the true names inserted.

The lawyers and investment bankers who coded the documents, however, reckoned without Chiarella. Appellant was not merely an ordinary printer, but a knowledgeable stock trader who spoke with his broker as often as ten or fifteen times a day. In each of the five cases, he was able to deduce the name of the target company from other information in the documents—price histories, par values, and the number of letters in the mock corporate names. Then, disregarding notices posted throughout Pandick that use of customer information for personal gain was both illegal and against company rules, he would call his broker and buy shares of the target's stock.

Of course, when each tender offer was publicly announced, the market price of Chiarella's recently purchased shares increased sharply. Chiarella quickly sold out and turned a handsome profit. In the Emhart tender offer, for example, Emhart's lawyers brought the first set of documents to Pandick on September 3, 1975. By September 5, Chiarella had concluded that "Arabia" was Emhart and "USA" was USM. On that day, he bought 200 shares of USM common stock for his own account and 100 shares for his father's. On September 9, after the tender offer was announced, he sold all the stock at a profit of $1019.11. Over the five takeover bids covered by the indictment, Chiarella netted more than $30,000.[3]

■ Unfortunately for Chiarella, this "sure bet" did not last forever. In early 1977, the SEC initiated an investigation

---

**2.** Four of the transactions were in fact tender offers and one was a merger. The record is unclear which, if any, of the takeover bids were "hostile" in the sense that they were opposed by the target's management. The parties have not treated either distinction as significant.

**3.**

| | | Purchases | | | |
|---|---|---|---|---|---|
| Target | Offeror | Shares | Date | Date Sold | Profit |
| USM | Emhart | 300 | 9/ 5/75 | 9/ 9/75 | $ 1,019.11 |
| Riviana Foods (Merger) | Colgate-Palmolive | 2300 | 2/ 5/76 to 2/10/76 | 2/26/76 to 3/16/76 | $ 8,948.55 |
| FoodTown Stores | Delhaize Freres | 1100 | 10/11/76 | 10/21/76 to 12/ 1/76 | $ 2,990.30 |
| Booth Newspapers | Times-Mirror | 100 | 10/21/76 | 10/22/76 | $ 914.56 |
| Sprague Electric | General Cable | 3200 | 11/10/76 | 11/15/76 | $16,138.87 |
| | | | | Total Profit: | $30,011.39 |

into Chiarella's activities. In May, he agreed in a consent decree to disgorge his profits to those who had sold him target stock[4] and, the same day, was discharged by Pandick. Finally, on January 4, 1978, he was indicted on seventeen counts of willful misuse of material[5] nonpublic information in connection with the purchase and sale of securities, purportedly in violation of § 10(b) and Rule 10b–5.[6] After moving unsuccessfully to dismiss the indictment on the ground that it did not charge a crime, he was convicted by the jury on every count.[7] This appeal followed.

## II.

■ Chiarella admits to the activities outlined above. He recognizes, moreover, that since *SEC v. Texas Gulf Sulphur Co.,* 401 F.2d 833 (2d Cir. 1968) (*en banc*), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), it has been black letter law that

anyone in possession of material inside information must either disclose it to the investing public, or, if he is disabled from disclosing it in order to protect a corporate confidence, or he chooses not to do so, must abstain from trading in or recommending the securities concerned while such inside information remains undisclosed. *Id.* at 848.

But because he was not an insider of the target corporations, he argues, he did not owe a fiduciary duty to target shareholders who sold before the tender offer was announced. Thus, he claims, he was not subject to the "disclose or abstain" rule of *Texas Gulf Sulphur,* and, consequently, the indictment fails to charge a violation of Rule 10b–5. We disagree.

## A.

That appellant was not an insider of the companies whose securities he traded is true, but irrelevant. A financial printer such as Chiarella is as inside the market itself as one could be.

In practical terms, the services of a financial printing firm are a prerequisite for the

---

**4.** *SEC v. Chiarella,* No. 77 Civ. 2534 (GLG) (S.D.N.Y. May 24, 1977).

**5.** The information concerning the impending tender offers was stipulated to be material.

**6.** The indictment was brought under § 32(a), the penalty provision of the 1934 Act, 15 U.S.C. § 78ff(a):

Any person who willfully violates any provision of this chapter (other than section 78dd–1 of this title), or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required under the terms of this chapter, or any person who willfully and knowingly makes, or causes to be made, any statement in any application, report, or document required to be filed under this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 78o of this title or by any self-regulatory organization in connection with an application for membership or participation therein or to become associated with a member thereof, which statement was false or misleading with respect to any material fact, shall upon conviction be fined not more than $10,000, or imprisoned not more than five years, or both,

except that when such person is an exchange, a fine not exceeding $500,000 may be imposed; but no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation.

Chiarella made seventeen separate purchases of target stock over the course of the five takeover bids. Each count of the indictment represents a confirmation slip mailed to appellant by his broker following a telephoned buy order. These mailings were sufficient to invoke federal jurisdiction under the securities laws. *Little v. United States,* 331 F.2d 287, 292 (8th Cir. 1964); Matthews, *Criminal Prosecution Under the Federal Securities Laws and Related Statutes,* 39 G.W.L.Rev. 901, 921–22 (1971).

**7.** Judge Owen's decision on the motion to dismiss is reported at 450 F.Supp. 95 (S.D.N.Y. 1978).

Appellant was sentenced to concurrent terms of one year on counts one through thirteen, to be suspended following one month's imprisonment. Imposition of sentence on the remaining counts was suspended, and he was placed on probation for five years following his release from prison.

successful execution of a tender offer. These auxiliaries of the securities industry are a central, though generally unheralded, cog in the vital machinery for disseminating information to investors. From his vantage point in the composing room of Pandick Press, Chiarella had access on a regular basis to the most confidential information in the world of finance. Five times in less than fifteen months he obtained knowledge of facts that, when released, would have an immediate and dramatic effect "on the Street."

■ For the securities markets to function properly, it is essential that those who occupy such strategic places in the market mechanism be forbidden to reap personal gains from information received by virtue of their position. Indeed, Rule 10b–5 prohibits *corporate* insiders from trading on nonpublic *corporate* information only because their ready access to the intimate details of their companies' problems and prospects gives them an unfair advantage over persons with whom they deal. *See, e. g., Texas Gulf Sulphur, supra,* 401 F.2d at 848 ("[T]he Rule is based in policy on the justifiable expectation of the securities marketplace that all investors trading on impersonal exchanges have relatively equal access to material information."); *Speed v. Transamerica Corp.,* 99 F.Supp. 808, 829 (D.Del.1951); Fleischer, Mundheim & Murphy, *An Initial Inquiry into the Responsibility to Disclose Market Information,* 121 U.Pa.L.Rev. 798, 818 (1973). Yet even the most unscrupulous officer or director could scarcely have a greater opportunity to reap

sure profits than market, insider Chiarella had by virtue of the market information at his disposal.[8] Accordingly, we believe that the principle underlying *Texas Gulf Sulphur* is not so narrow as Chiarella contends. In enacting the securities laws, Congress did not limit itself to protecting shareholders from the peculations of their officers and directors. A major purpose of the antifraud provisions was to "protect the integrity of the marketplace in which securities are traded." *United States v. Brown,* 555 F.2d 336, 339 (2d Cir. 1977). *Anyone*—corporate insider or not—who regularly receives material nonpublic information may not use that information to trade in securities without incurring an affirmative duty to disclose. And if he cannot disclose,[9] he must abstain from buying or selling.

■ The American Law Institute's *Federal Securities Code* has suggested a category of "quasi-insiders" that bears a strong resemblance to the concept of market insider developed above. *See id.* § 1603, comment 3(d), at 538–39 (Proposed Official Draft 1978). In rejecting a *per se* disclose-or-abstain rule for quasi-insiders, the ALI appeared primarily concerned with defining the scope of the category. *Id.* It therefore chose not to include these individuals in the "insider trading" section of the *Code* (§ 1603). But the Institute specifically indicated that "egregious" cases would fall under the proscription of § 1602, its recodification of Rule 10b–5. *Code, supra,* at 539. Compare Fleischer, Mundheim & Murphy, *supra,* 121 U.Pa.L.Rev. at 819–24. A test of "regular access to market information" ap-

---

**8.** "Market information" refers to information that affects the price of a company's securities without affecting the firm's earning power or assets. *See* Fleischer, Mundheim & Murphy, *supra,* 121 U.Pa.L.Rev. at 799. Examples include information that an investment adviser will shortly issue a "buy" recommendation or that a large stockholder is seeking to unload his shares—or that a tender offer will soon be made for the company's stock. Of course, from the point of view of a shareholder who sells his stock on the day before the price jumps sharply upward, it matters little whether

the cause of the rise was news of an ore strike, *see Texas Gulf Sulphur, supra,* or, as here, the announcement of a tender offer. *See* ALI Federal Securities Code § 1603, comment 2(j), at 531–32; *Oppenheimer & Co.,* Exch. Act Rel. No. 12319, [1975–1976 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 80,551, at 86,415 & n.3 (1976).

**9.** Chiarella, of course, was disabled from disclosing his knowledge of the tender offers by his duty to his employer not to reveal clients' confidences.

pears to us to provide a workable rule. There should be no greater difficulty in resolving close cases than is inherent in determining who is a "corporate insider" under *Texas Gulf Sulphur. See Code, supra,* § 1603, comment 3(e), at 540. In any event, we believe Chiarella's conduct was sufficiently egregious to fit the most restrictive definition of a quasi-insider who would be barred from trading by the general provisions of § 1602.

A duty to disclose arising out of regular access to market information is not a stranger to the world of 10b–5. In *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), the First Security Bank of Utah acted as transfer agent for shares of the Ute Development Corporation, which was created by the federal government to hold assets for a group of mixed-blood Ute Indians. There were effectively two separate markets for the shares—a primary market consisting of Indians selling to whites through the Bank, and a resale market consisting entirely of whites. The price per share was significantly higher in the resale market, but the Indians did not know of the existence of the resale market nor, of course, of the price differential. Gale and Haslem, two employees of the Bank, bought from Indians and sold to whites, thereby realizing substantial profits. The Supreme Court held that the employees' position at the center of the two markets gave rise to a Rule 10b–5 affirmative duty to disclose. 406 U.S. at 153, 92 S.Ct. 1456.[10]

### B.

We are not to be understood as holding that no one may trade on nonpublic market information without incurring a duty to disclose. Indeed, as Chiarella has persistently reminded us, a would-be tender offeror may purchase up to 5% of the stock of its prospective target without making any disclosure at all. *General Time Corp. v. Talley Industries, Inc.,* 403 F.2d 159, 164 (2d Cir. 1968), *cert. denied,* 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969); *see* 15 U.S.C. § 78m(d); *Kennecott Copper Corp. v. Curtiss-Wright Corp.,* 584 F.2d 1195, 1205–1207 (2d Cir. 1978). Because offerors may trade, and because he obtained his information from them, appellant would have us conclude that he, too, could purchase target stock before the tender offer is announced, subject only to the 5% limitation of the Williams Act, 15 U.S.C. §§ 78m(d), 78n(d). But the offerors and Chiarella occupy entirely different positions with respect to trading on news of an impending tender offer.

It is clear, at the outset, that an offeror is not a "market insider" as this term has been defined above. It does not regularly receive nonpublic information concerning any stock but its own.[11] Indeed, with respect to tender offers, it does not receive information but creates it.

Moreover, in making a tender offer at a premium above the pre-offer market price, the offeror is undertaking a substantial eco-

**10.** Specifically, the Court applied our decision in *Chasins v. Smith, Barney & Co.,* 438 F.2d 1167 (2d Cir. 1971), to hold that Gale and Haslem were *de facto* market makers and obliged to reveal that fact to the Indians. Both we and the Supreme Court relied exclusively on Rule 10b–5 to establish the duty, and did not look to Rule 15c1–4, which regulates the conduct of broker-dealers. 406 U.S. at 154 n. 16, 92 S.Ct. 1456; 438 F.2d at 1172–73. *Cf. SEC v. Spectrum, Ltd.,* 489 F.2d 535, 541–42 (2d Cir. 1973) ("unique and pivotal role" of legal profession in distribution of securities justifies higher-than-usual standard of conduct).

We disagree with Judge Meskill's narrow reading of *Affiliated Ute Citizens.* It is highly doubtful whether, under the facts of that case,

a mere transfer agent would have had access to the detailed price and market information available to the bank employees. Accordingly, the Court's *dictum* that a transfer agent would not incur a duty to disclose, 406 U.S. at 151–52, 92 S.Ct. 1456, should not be interpreted as a holding precluding liability of Chiarella, who *did* have regular access to non-public information of vital concern to investors.

**11.** When it does, of course, it may be liable as an ordinary insider. *Crane Co. v. Westinghouse Air Brake Co.,* 419 F.2d 787, 796 (2d Cir. 1969), *cert. denied,* 400 U.S. 822, 91 S.Ct. 41, 27 L.Ed.2d 50 (1970).

nomic risk that his tempting target will prove to be a "white elephant." Although it knows that the price of the target stock will rise when the takeover bid is announced, the offeror has no alchemic power to transform this knowledge into a certain profit. The only reason it can be confident that its purchases will soon appreciate in value is that it will soon place a much greater sum of money at risk. When the price goes up, the offeror will be *buying*, not selling.

■ The offeror's pre-offer market purchases thus represent its willingness to back its judgment that target stock is undervalued by the market. This course of action is entirely consistent with the principles underlying the securities laws. The legislative history of the 1934 Act emphasizes

> [t]he idea of a free and open public market [that] is built upon the theory that competing judgments of buyers and sellers as to the fair price of a security brings about a situation where the market price reflects as nearly as possible a just price.

H.R.Rep.No. 1383, 73d Cong., 2d Sess. 11 (1934); *accord,* S.Rep.No. 1455, 73d Cong., 2d Sess. 81 (1934). Nor are these principles in any way diminished by the 5% limit on pre-offer market purchases established by the Williams Act, 15 U.S.C. §§ 78m(d), 78n(d). That legislation was not designed to interfere with an offeror's exercise of its economic judgment. Rather, its principal purpose was to prevent the "stampede effect" that the publicity associated with tender offers has on target shareholders. *See, e. g., Rondeau v. Mosinee Paper Co.,* 422 U.S. 49, 58 & n.8, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975); E. Aranow, H. Einhorn & G. Berlstein, *Developments in Tender Offers for Corporate Control* 10–16 (1977).

Let us now consider Chiarella. In stark contrast to the offerors, he has taken no economic risk whatsoever. Indeed, his "investments" were less speculative than those of the defendants in *A. T. Brod & Co. v. Perlow,* 375 F.2d 393 (2d Cir. 1967). The Perlows ordered stock from their broker but refused to pay when the price had not gone up by settlement date. Chiarella, however, had virtually certain knowledge that he could sell out at a substantial profit.[12] Moreover, as in *Perlow,* Chiarella's market activity created an artificial demand for target stock that had a distorting effect on the free play of market forces envisioned by the securities laws. *See id.* at 397; Schotland, *Unsafe at Any Price: A Reply to Manne,* Insider Trading and the Stock Market, 53 Va.L.Rev. 1425, 1448–52 (1967).

■ Viewed in this light, Chiarella's reliance upon *General Time Corp. v. Talley Industries, Inc., supra,* is ironic. To support his assertion that *General Time* limits the affirmative duty to disclose to outsiders of the issuer, Chiarella misuses Judge Friendly's comment that:

> We know of no rule of law, applicable at the time, that a purchaser of stock, who was not an "insider" and had no fiduciary relation to a prospective seller, had any obligation to reveal *circumstances that might raise a seller's demands and thus abort the sale.* 403 F.2d at 164 (emphasis added).[13]

Appellant would place himself in the shoes of the offerors, but the shoes do not fit. Chiarella was not a "tippee" of Pandick's clients, with liability derivative only through them. In clear violation of his duties as agent, *Restatement (2d) Agency* § 395, he converted to his personal use confidential information entrusted to him in

---

12. Appellant's counsel suggested at oral argument that Chiarella bore the risk that tender offer plans would collapse between the time he purchased target stock and the date set for the public announcement. We reject any contention that this remote and nebulous possibility is at all comparable to the risk borne by the offeror.

13. The allusion to a change in the applicable law refers to enactment of the Williams Act, which became effective after the transactions at issue in *General Time.* As we indicated earlier, that legislation does not affect the existence of a market insider's duty to disclose.

the course of his employment. He may not relieve himself of his market insider's duty of disclosure by claiming the protection of persons he has defrauded.[14]

Indeed by entering the market for target stock on the basis of advance knowledge of a tender offer, Chiarella exerted upward pressure on the price of the stock. In this manner, he achieved precisely the result Judge Friendly so assiduously sought to avoid in *General Time.* *See* E. Aranow, H. Einhorn & G. Berlstein, *supra,* at 20; Fleischer, Mundheim & Murphy, *supra,* 121 U.Pa.L.Rev. at 815.[15]

We conclude, therefore, that Chiarella's conduct violated Rule 10b–5, and the indictment accordingly charges a crime.[16] Congress enacted § 10(b) to prohibit conduct that destroyed confidence in the securities markets. *See, e. g.,* 15 U.S.C. § 78b; *United States v. Brown, supra.* The section was specifically designed to prohibit "those manipulative and deceptive practices which have been demonstrated to fulfill no

**14.** This suffices to dispose of appellant's contention that Judge Owen erred in permitting the prosecutor to argue that Chiarella's conduct defrauded the offerors as well as the sellers. The prosecutor was making a legitimate response to the principal pillar of the defense theory of the case, that Chiarella could trade because the offerors could trade. In any event, the indictment fairly charges Chiarella violated Rule 10b–5 by converting offerors' confidential information to his own use. It not only alleged that appellant's activities "operated as a fraud and deceit upon the sellers of the aforementioned securities," it also charged a "scheme to defraud" in general terms. Clearly, violation of an agent's duty to respect client confidences, *Restatement (2d) Agency* § 395, transgresses Rule 10b–5 where, as here, the converted information both concerned securities and was used to purchase and sell securities. *Cf. Superintendent of Insurance v. Bankers Life & Cas. Co.,* 404 U.S. 6, 9–10, & n. 7, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); *United States v. Brown, supra; A. T. Brod & Co. v. Perlow, supra.*

**15.** We wish to make it clear that we are not relying on any concept of "business purpose" in distinguishing Chiarella from Pandick's clients, whose confidential information appellant converted to his own use. In this respect, we differ with Judge Owen, who relied at least in part on the offerors' "presumptively legitimate business purpose to promote economic growth," 450 F.Supp. at 97. We agree with appellant that "business purpose" cannot be dispositive of liability under Rule 10b–5. *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

But the presence or absence of a business purpose has no bearing on Chiarella's liability for defrauding the sellers. That arises solely from appellant's position as a market insider and his breach of his resulting duty not to trade on market information without disclosure. With respect to the sellers, the economic analysis adumbrated in the text serves only to demonstrate why Chiarella may not claim the benefits of the *General Time* doctrine. Equally,

business purpose is irrelevant to Chiarella's culpability for defrauding the offerors. His guilt there arises from a conversion of property —Pandick's clients' information—that is intimately connected with the purchase and sale of securities. *See* note 14 *supra.*

In any event, *Santa Fe Industries* arose on facts entirely different from those of the case at bar. In *Santa Fe,* the question was whether lack of business purpose would create liability under Rule 10b–5 even when all required disclosures were made. 430 U.S. at 474–77, 97 S.Ct. 1292. Chiarella, of course, made no disclosure whatsoever.

Moreover, Chiarella's contention that there was no fraud because the sellers did not suffer injury by reason of his conduct is without merit. Appellant suggests that, even were he to have abstained from trading, the target shareholders would still have placed their orders to sell. Consequently, his failure to abstain was not a "but for" cause of the losses the sellers incurred by unloading their shares before the tender offer announcements. This argument, however, is weightless. It would be equally applicable to the shareholders in *Texas Gulf Sulphur,* who would have sold even had the TGS insiders not been purchasing on their advance knowledge of the company's ore strike.

**16.** We are unpersuaded by our dissenting brother's argument that Rule 10b–5 must be construed more narrowly in criminal prosecutions than in civil enforcement actions. Section 32(a) of the 1934 Act, 15 U.S.C. § 78ff(a), provides criminal penalties for willful violations of "*any* rule or regulation . . . the violation of which is made unlawful." (emphasis added) It is well-established that, except for issues of intent and burden of proof, criminal and civil liability under the securities laws are coextensive. *United States v. Peltz,* 433 F.2d 48, 53 (2d Cir. 1970) (Friendly, J.), *cert. denied,* 401 U.S. 955, 91 S.Ct. 974, 28 L.Ed.2d 238 (1971); *United States v. Charnay,* 537 F.2d 341, 348 (9th Cir.) (citing cases), *cert. denied,* 429 U.S. 1000, 97 S.Ct. 527, 50 L.Ed.2d 610 (1976).

useful function." S.Rep.No. 792, 73d Cong., 2d Sess. 6 (1934). It is difficult to imagine conduct less useful, or more destructive of public confidence in the integrity of our securities markets, than Chiarella's.

### C.

■ Appellant contends that interpreting Rule 10b–5 to impose an affirmative duty of disclosure on a person other than a corporate insider would be so novel a construction of the Rule as to violate the fair notice element of due process. We believe, however, that today's holding is but a logical application of the congressional policies underlying the rule of *Texas Gulf Sulphur.* That no prior litigated case has involved the precise fact pattern at issue here is not dispositive. *United States v. Brown, supra,* 555 F.2d at 339–40; *United States v. Charnay,* 537 F.2d 341, 349–50 (9th Cir.), *cert. denied,* 429 U.S. 1000, 97 S.Ct. 527, 50 L.Ed.2d 610 (1976). All that is necessary is that "a clear and definite statement of the conduct proscribed" antedate the actions alleged to be criminal. *United States v. Persky,* 520 F.2d 283, 288 (2d Cir. 1975).

■ Under this principle, Chiarella manifestly had adequate notice that his trading in target stock could subject him to criminal liability. He was not the first printer to have felt the wrath of the SEC. On August 12, 1974, the Commission filed a complaint alleging that various employees of Sorg Printing Co. had engaged in activities identical to Chiarella's. The employees eventually consented to entry of preliminary injunctions against them. *SEC v. Sorg Printing Co.,* [1974–1975 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,034 (S.D. N.Y. March 28, 1975).[17]

The *Sorg* decree was well publicized and aroused widespread concern in the financial printing industry. Pandick undertook to notify its employees that trading on the basis of information contained in customers' copy could violate the securities laws. It prepared 8″ x 10″ signs, in large, boldface type, reading:

TO ALL EMPLOYEES:

The information contained in all type set and printing done by Pandick Press, Inc., is the private and personal property of the customer.

You are forbidden to use any information learned from customer's copy, proofs or printed jobs for your own or anyone else's benefits, friend or family or talking about it except to give or receive instructions. Any violation of this rule will result in your being fired immediately and without warning.

In addition, you are liable to criminal penalties of 5 years in jail and $10,000 fine for each offense.

If you see or hear of anybody violating this, report it immediately to your supervisor or to Mr. Green or Mr. Fertig. Failure to report violations will result in your being fired.

These signs were posted on bulletin boards throughout the Pandick shop before September 5, 1975, when Chiarella made his first purchase of target stock. During the entire fifteen-month period covered by the indictment, the prominent sign over the timeclock where Chiarella punched in and out glared at him daily. On cross-examination, appellant admitted passing the sign at least 640 times. The jury need not have believed his testimony that he never read it.[18] Few malefactors receive such explicit warning of the consequences of their conduct.

---

**17.** Since *Sorg,* the SEC has obtained consent decrees against three additional printers (not including Chiarella). *SEC v. Manderano,* [Current] Fed.Sec.L.Rep. (CCH) ¶ 96,357 (D.N.J. March 22, 1978); *SEC v. Primar Typographers, Inc.,* [1976–1977 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 95,734 (S.D.N.Y.1976); *SEC v. Ayoub,* [1975–1976 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 95,567 (S.D.N.Y.1976). *Cf. SEC*

*v. Healy,* SEC Litigation Rel. No. 6589 (S.D. N.Y. Nov. 18, 1974) (officers of tender offeror).

**18.** The notice was also printed in the union newspaper, on the back of Chiarella's timecard, and in separate cards distributed to Pandick employees. Chiarella testified that he never read any of these, although he admitted knowing that Sorg employees "violated company

### III.

We turn now to the second major issue raised on this appeal—the level of intent necessary to support a conviction for criminal violations of Rule 10b–5. Chiarella's state of mind was the only significant issue at trial.

Judge Owen charged the jury that it could not convict Chiarella unless it found that he had acted "knowingly" and "willfully," and defined these terms to mean that "the defendant must be aware of what he was doing and what he was not doing" and that he must be acting deliberately, and not as a result of "innocent mistakes, negligence, or inadvertence or other innocent conduct." He concluded:

> All that is necessary for this second element to be satisfied is that the government establish a realization on the defendant's part that he was doing a wrongful act, assuming that you find that Chiarella's conduct was wrongful under the securities law as I have explained in the previous element, and that the knowingly wrongful act involved a significant risk of effecting the violation that occurred. Jt.App. 778a.

This language has been specifically approved for prosecutions brought, like this one, under § 32(a) of the 1934 Act, 15 U.S.C. § 78ff(a), which punishes willful violations of the Act's substantive provisions or of rules promulgated under it. *United States v. Peltz*, 433 F.2d 48, 54–55 (2d Cir. 1970), *cert. denied*, 401 U.S. 955, 91 S.Ct. 974, 28 L.Ed.2d 238 (1971); *United States v. Dixon*, 536 F.2d 1388, 1395–97 (2d Cir. 1976).

▆ Chiarella does not dispute that Judge Owen's charge adequately defines the level of intent required by § 32(a) itself. Rather, he contends that when the substantive provisions are § 10(b) and Rule 10b–5, the Government must prove the additional element of specific intent to defraud. In advancing this proposition he cites the statement in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), that a civil action for damages under the antifraud provisions of the 1934 Act must fail absent proof of " 'scienter'—intent to deceive, manipulate, or defraud," *id.* at 193, 96 S.Ct. at 1381.

Courts and commentators alike have noticed, however, that, read as a whole, the *Hochfelder* opinion does not yield such a clear and ineluctable explication of the meaning of "scienter." *See, e. g., Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 44–47 (2d Cir. 1978), *petition for cert. filed*, 47 U.S.L.W. 3266 (U.S. Oct. 2, 1978) (No. 78–560); *United States v. Charnay, supra*, 537 F.2d at 357–59; Bucklo, *The Supreme Court Attempts to Define Scienter Under Rule 10b–5*, 29 Stan.L.Rev. 213, 216–17 (1977). The Court was primarily concerned with rejecting Hochfelder's contention that mere negligent omissions sufficed to establish a claim under Rule 10b–5, and it did not settle fine points of definition. In particular it left open whether reckless conduct is sufficient, 425 U.S. at 193 n. 12, 96 S.Ct. 1375, and variously described its holding as requiring "some element of scienter," *id.* at 201, 96 S.Ct. 1375, and "knowing or intentional misconduct," *id.* at 197, 96 S.Ct. 1375. A fair reading of *Hochfelder* indicates that the Court used the term "scienter" only to contrast negligence and not to establish a standard of specific intent to defraud.

Indeed, such fraudulent intent was not required by any of the cases or commentators cited by the *Hochfelder* Court as favoring a scienter requirement in 10b–5 actions, *see* Bucklo, *supra*, at 219 & nn.30 & 31, nor

---

policies and they were discharged." At the sentencing hearing, Judge Owen found that Chiarella's testimony that he had not read the notices was perjury beyond a reasonable doubt.

We do not suggest, of course, that the notices posted by Pandick somehow expanded the scope of liability under § 10(b) and Rule 10b–5.

Our Brother Meskill misreads us on this point. Chiarella's conduct was rendered illegal by the language and policy of the statute and rule. The sign merely informed appellant of the SEC's view of the law—a view we today hold was correct.

was it generally required at common law, see id. at 228–30. And, since Hochfelder, we have held that, under some circumstances, reckless disregard of the truth will satisfy the scienter requirement in a private civil action for damages. Rolf v. Blyth, Eastman Dillon & Co., supra. Finally, the only court to reach the issue has held the Peltz-Dixon charge to be consistent with Hochfelder. United States v. Charnay, supra, 537 F.2d at 357–59 (on petition for rehearing in light of Hochfelder).

 In the case before us, Chiarella was convicted under a charge requiring the jury to find beyond a reasonable doubt that he engaged in "knowingly wrongful" misconduct.[19] We do not believe that Hochfelder requires more than this. Accordingly, Judge Owen correctly refused to charge the jury that the Government must prove specific intent to defraud.[20]

### IV.

Chiarella's arguments on the issues of intent, however, are not limited to his claim under Hochfelder. He asserts that numerous errors in Judge Owen's evidentiary rulings and jury instructions, individually and cumulatively, prevented the jury from fairly considering his contention that he did not have a culpable state of mind. Our examination of the record convinces us that the trial court acted properly in all respects.

 For example, the district judge refused to permit Chiarella to testify that he had never heard of anyone being prosecuted for what he had done. But under the Peltz-Dixon test, the willfulness requirement of § 32(a), is satisfied by a general awareness of wrongful conduct, Peltz, supra, at 55, which may exist even if a defendant believes his chicanery is in technical compliance with the law, Dixon, supra, at 1396. Chiarella's proffered testimony, therefore, was at best tangentially relevant. Considering the prejudice to the Government that might arise from a suggestion that Chiarella was unfairly singled out for prosecution, Judge Owen did not abuse his broad discretion under Fed.R.Evid. 403 by barring the testimony. See, e. g., United States v. King, 560 F.2d 122, 128 (2d Cir.), cert. denied, 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977). Similarly, the trial judge did not err in excluding, as irrelevant and prejudicial, evidence that appellant disgorged his profits to the sellers of his target securities. It is difficult to see how Chiarella's state of mind during the operation of his scheme would be illuminated by evidence that afterwards he agreed to an SEC decree requiring restitution. Post v. United States, 132 U.S.App.D.C. 189, 196–98, 407

19. There is no question as to the adequacy of the evidence to support the verdict. Chiarella admitted knowing that his actions violated company policy and made him liable to discharge. And although he testified that he thought his conduct was legal (because the offerors had the right to trade) and that he did not believe that "anything criminal would come of it," he admitted on cross-examination that he knew his conduct was "wrong" and "against the SEC." Contrary to Chiarella's suggestion, he was not convicted for violating company policy. His knowledge that he was doing so however, constituted a culpable state of mind sufficient to satisfy the Peltz-Dixon test of willfulness under § 32(a).

20. We also believe that the district judge did not, as Chiarella suggests, direct a verdict of guilty by charging the jury that "in the context of this case, assuming you find the requisite state of mind, a failure by Chiarella to disclose material, nonpublic information in connection with his purchase of stock would constitute deceit." This charge was given as part of the definition of "scheme to defraud" in Rule 10b–5(a). Construction of the words of a statute (and, of course, a rule) is the court's function. E. g., United States v. Santiago, 528 F.2d 1130, 1135 (2d Cir.), cert. denied, 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976). United States v. United States Gypsum Co., —— U.S. ——, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978), is not to the contrary. That case held it an impermissible encroachment on the jury's fact-finding role to charge that defendants are presumed to have intended to fix prices if their conduct would have that effect. Id. —— U.S. at ——–——, 98 S.Ct. at 2872–77, 57 L.Ed.2d at 868–75. Here, the trial judge repeatedly told the jury that it must determine Chiarella's state of mind for itself; indeed, the portion quoted as objectionable specifically so states.

F.2d 319, 326–28 (1968), *cert. denied*, 393 U.S. 1092, 89 S.Ct. 863, 21 L.Ed.2d 784 (1969).[21]

## V.

Finally, Chiarella challenges a series of other rulings below, each of which he claims constituted reversible error. Only one of these contentions requires extended discussion.

Shortly after he was discharged by Pandick, appellant sought unemployment benefits from the New York State Department of Labor. In connection with the application, he signed a statement admitting that he was discharged for misusing confidential information and that "the allegation is true." When the Government subpoenaed the Labor Department file for use at trial, Chiarella moved to suppress the statement on the ground that it was privileged under N.Y. Labor Law § 537 (McKinney 1977). The statute provides that statements made in applying for unemployment benefits "shall not . . . be used in any court in any action or proceeding pending therein unless the commissioner [of labor] is a party to such action or proceeding."

We believe Judge Owen correctly denied the suppression motion and admitted the statement. State-created privileges[22] are not controlling in federal criminal cases except to the extent they reflect "the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience," Fed.R.Evid. 501. *E. g., United States v. Craig*, 7 Cir., 528 F.2d 773, 776 (majority), 781 (Tone, J., concurring on point), *aff'd en banc per curiam on panel concurrence*, 537 F.2d 957 (7th Cir.), *cert. denied*, 425 U.S. 973, 96 S.Ct. 2171, 48 L.Ed.2d 796, 429 U.S. 999, 97 S.Ct. 526, 50 L.Ed.2d 609 (1976). To the extent § 537 does create a privilege under New York law, an issue we need not decide, it is one unknown to the common law. In view of the strong federal policy favoring admissibility in criminal cases, *see, e. g., United States v. Nixon*, 418 U.S. 683, 708–13 & n. 18, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the district court properly held the statement admissible. *See United States v. DiCarlo*, 565 F.2d 802, 806 (1st Cir. 1977), *cert. de-*

---

**21.** We also conclude that it was not error to charge the jury that "the repeated similar acts or conduct in the indictment may be considered circumstantial evidence of unlawful intent." Similar acts evidence is frequently highly probative on issues of intent. *See, e. g.*, Fed.R. Evid. 404(b); *United States v. Grady*, 544 F.2d 598, 604–05 (2d Cir. 1976); *United States v. Broadway*, 477 F.2d 991, 994 (5th Cir. 1973); *United States v. Deaton*, 381 F.2d 114, 117–18 (2d Cir. 1967) (citing cases). Although Chiarella did not contend he acted inadvertently, or through mistake, *see United States v. Semak*, 536 F.2d 1142, 1144–45 (6th Cir. 1976), the fact that he engaged in five separate transactions over a period of fifteen months would permit the jury to infer that his mind was focused on the nature of his acts, *see United States v. Catalano*, 491 F.2d 268, 275–76 (2d Cir.), *cert. denied*, 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 48 (1974). In *United States v. Marcus*, 429 F.2d 654, 657–58 (3d Cir. 1970), relied on by Chiarella, the defendant was charged with knowingly attempting to pledge stolen securities. An instruction permitting the jury to infer knowledge that the securities were stolen from evidence that defendant later sought to pledge

other securities was held to be prejudicial error in the absence of proof that the latter securities were themselves stolen. *Id.* at 658. In short, the second attempt to pledge was not a "similar act," and *Marcus* is clearly distinguishable from the case before us. *See id.* at 658 n. 3.

**22.** Chiarella contends that the Federal Unemployment Tax Act, 26 U.S.C. § 3304(a)(16), (17), providing for federal approval of state unemployment laws, transforms § 537 into an "Act of Congress" for purposes of Fed.R.Evid. 501. We are not inclined to read § 3304 so broadly because, as the Government has pointed out, the Secretary of Labor has approved unemployment laws in at least two states— Massachusetts and Washington—that specifically permit disclosure to prosecutors of statements such as Chiarella's. Mass.Ann. Laws ch. 151A, § 46 (Michie/Law. Coop. 1976); Wash.Rev. Code §§ 50.13.060, .070. In any event, this ground for excluding the statement was not raised below and is therefore waived. *E. g., United States v. Fuentes*, 563 F.2d 527, 531 (2d Cir.), *cert. denied*, 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977).

*nied,* 435 U.S. 924, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978); *United States v. Schoenheinz,* 548 F.2d 1389 (9th Cir. 1977) (per curiam); *In re Grand Jury,* 541 F.2d 373, 378–83 (3d Cir. 1976); *Craig, supra.*

We have carefully considered appellant's remaining contentions and find them to be without merit. The judgment is affirmed.

MESKILL, Circuit Judge, dissenting:

I respectfully dissent. Today's decision expands § 10(b) drastically, it does so without clear indication in prior law that this is the next logical step on the path of judicial development of § 10(b), and, alarmingly, it does so in the context of a criminal case.

### *Nondisclosure Under § 10(b) and Rule 10b–5.*

The majority holds that Chiarella committed a § 10(b) violation by breaking the "disclose or abstain" rule of *SEC v. Texas Gulf Sulphur,* 401 F.2d 833, 848 (2d Cir. 1968) (*en banc*), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). However, we have been cited no case in which even civil liability for nondisclosure has been imposed under § 10(b) on anyone other than an insider, the tippee of an insider, or one standing in a special relationship with other traders. More specifically, we have been cited no case in which *criminal* liability for § 10(b) nondisclosure has been imposed on *any* purchaser of stock, either insider *or* outsider. The majority terms "irrelevant" the fact that Chiarella was neither an insider of the companies whose securities he purchased, nor the tippee of an insider. Chiarella's location "inside the market itself" is today held to place him in a special relationship with all buyers and sellers with whom he might deal—a relationship which triggers the duty either to abstain or to

disclose material nonpublic information. I am sympathetic to the majority's view that imposition of the duty to abstain or disclose on those who occupy strategic positions in the securities industry may further important goals embodied in the securities acts, such as maintaining investor confidence in the integrity of the market. However, we must resist the temptation to redraft legislation, in effect, by reading into it what we would like to see written there, especially where a criminal conviction is at issue.

That today's application of § 10(b) is a departure from prior law cannot be disputed.[1] In *General Time Corp. v. Talley Industries, Inc.,* 403 F.2d 159, 164 (2d Cir. 1968), *cert. denied,* 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969), this Court rejected a claim that a company acquiring stock in another corporation must disclose to selling shareholders plans for an eventual merger:

> We know of no rule of law, applicable at the time, that a purchaser of stock, who was not an "insider" and had no fiduciary relation to a prospective seller, had any obligation to reveal circumstances that might raise a seller's demands and thus abort the sale.

The Williams Act, not yet effective at the time of the transactions at issue in *General Time,* does impose disclosure obligations on certain large scale purchasers of stock, but it is conceded that Chiarella's trading was not covered by its provisions. *See* 15 U.S.C. §§ 78m(d), 78n(d).

As the commentators cited by the majority have observed, "[t]he duty to disclose material, non-public information has not been imposed on every person possessing this type of information. Traditionally, this obligation has been limited to persons with a special relationship *to the company affected by the information.*" Fleischer, Mundheim & Murphy, *An Initial Inquiry*

---

1. Indeed, this Court sitting *en banc* has stated that "to read Rule 10b–5 as placing an affirmative duty of disclosure on persons who in contrast to 'insiders' or broker-dealers did not occupy a special relationship to a seller or buyer of securities, would be occupying new ground

and would require most careful consideration." *SEC v. Great American Industries, Inc.,* 407 F.2d 453, 460 (2d Cir. 1968) (*en banc*), *cert. denied,* 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969).

*into the Responsibility to Disclose Market Information,* 121 U.Pa.L.Rev. 798, 804 (1973) (emphasis added). *See also* Fleischer, *Securities Trading and Corporate Information Practices: The Implications of the* Texas Gulf Sulphur *Proceeding,* 51 Va.L. Rev. 1271, 1280 (1965). Commentators on securities fraud law often discuss persons covered by the Rule 10b–5 disclosure duty without mention of traders other than insiders or tippees of insiders. *See, e. g.,* 1 A. Bromberg, Securities Law: Fraud, § 7.4(6)(b), at 179–83 (1977). Bromberg notes that judicial decisions have generally adopted the SEC's own view that anyone is subject to Rule 10b–5 disclosure obligations if he or she "has inside information obtained by reason of access to the issuer." *Id.* at 179.

This access formula was first enunciated by the SEC itself in its leading decision of *Cady, Roberts & Co.,* 40 S.E.C. 907 (1961):

> Analytically, the obligation [that is, the affirmative duty to disclose material information] rests on two principal elements: first, the existence of a relationship giving access, directly or indirectly, to information intended to be available only for a corporate purpose and not for the personal benefit of anyone, and second, the inherent unfairness involved where a party takes advantage of such information knowing that it is unavailable to those with whom he is dealing. In considering these elements under the broad language of the anti-fraud provisions we are not to be circumscribed by fine distinctions and rigid classifications. *Thus our task here is to identify those persons who are in a special relationship with a company and privy to its internal affairs, and thereby suffer correlative duties in trading in its securities.*

*Id.* at 912 (emphasis added). Eleven years after the *Cady, Roberts* decision this approach to Rule 10b–5 had become so firmly entrenched that this Court remarked: "The essential purpose of Rule 10b–5, as we have stated time and again, is to prevent corporate insiders and their tippees from taking unfair advantage of the uninformed outsiders." *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876, 890 (2d Cir. 1972).

The majority's break with this § 10(b) tradition is accomplished by the creation of the new category of "market insider," into which former outsiders will henceforth be placed. The majority sees in this new category a strong resemblance to the concept of the "quasi-insider" suggested in the comments accompanying the American Law Institute's *Federal Securities Code* (Proposed Official Draft, March 15, 1978). However, the proposed code quite clearly imposes an affirmative duty of disclosure *only* on insiders (explicitly defined in terms of their relationship with or access to the *issuer*) and tippees of insiders. The Reporter's comments indicate that the difficulties that would be posed by extending this duty to a wider range of traders were deemed to outweigh the "convenience" of such an extension. Thus, the drafters of the proposed Code respectfully rejected the position taken by the three concurring judges in *SEC v. Great American Industries, Inc.,* 407 F.2d 453 (2d Cir. 1968) (*en banc*), *cert. denied,* 395 U.S. 920, 89 S.Ct. 1770, 23 L.Ed.2d 237 (1969), who expressed a willingness to catch non-insiders in the § 10(b) disclosure net. The ALI's proposed code, like prior law, explicitly recognizes that some cases of nondisclosure of material information by non-insiders, no matter how egregious, do not involve fraud and hence do not fall within the scope of § 10(b), the majority's statement to the contrary notwithstanding.[2]

Because § 10(b) and Rule 10b–5 apply to "any person," it is tempting to view limitations on the class of persons subject to an affirmative duty either to abstain or to disclose nonpublic information as overly technical barriers to the full pursuit of the goals of the federal securities laws. But

2. *See* § 1603 and accompanying notes, particularly comment 3(d). American Law Institute, *Federal Securities Code* (Proposed Official Draft, March 15, 1978).

§ 10(b) prohibits fraud not silence. And it is hornbook law that silence, unlike active misrepresentation, is fraudulent only when there is a duty to speak.[3] Prosser, Law of Torts § 106 (4th ed. 1971); 3 Loss, Securities Regulation, Chapter 9C (1961); 6 Loss, Securities Regulation, Chapter 9C (1969).

The majority suggests that the test of "regular access to market information" is a workable one for determining when such a duty is to be imposed on outsiders. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972), a civil case, is the only precedent cited to buttress the majority's assertion that a "duty to disclose arising out of regular access to market information is not a stranger to the world of 10b–5." *Affiliated Ute* involved a bank which had agreed with the Ute Distribution Corporation (UDC) to act as transfer agent for its stock, which was being sold by its Indian owners to non-Indians. The bank itself had acknowledged in a letter to an association representing the Indian sellers that it would be the bank's "'duty to see that these transfers were properly made'" and that "'the bank would be acting for the individual stockholders.'" *Id.* at 152, 92 S.Ct. at 1471. Despite the access of the bank and its employees to market information which was not known to the sellers, the Supreme Court explained that if the bank "had functioned merely as a transfer agent, *there would have been no duty of disclosure here." Id.* (emphasis added). It was because the defendants had devised a plan to induce the holders of the stock to sell and had developed and encouraged a market for their stock that defendants were held to have assumed an affirmative duty of disclosure. Thus, it was not the bank's clearly superior, regular access to

market information concerning UDC stock but its actions in undertaking to act for the sellers that rendered its silence equivalent to a scheme to defraud the selling shareholders. Chiarella certainly did not undertake to act for the sellers of the target stock, nor did he enter the type of special relationship with them which was determinative in *Affiliated Ute.*

The majority concedes, as it must, that the would-be tender offerors (also outsiders) from whom Chiarella derived his information may themselves purchase up to 5 percent of the target's stock without making any disclosure. *See* 15 U.S.C. §§ 78m(d), 78n(d); *General Time Corp. v. Talley Industries, Inc., supra,* 403 F.2d 159. The majority distinguishes purchases by the offeror and purchases by Chiarella on the ground that the offeror takes an economic risk and Chiarella does not. We have been cited no case holding that the degree of risk assumed by a trader in possession of nonpublic information is determinative of the trader's liability for nondisclosure or renders his conduct fraudulent.

Chiarella has not been shown to have owed a duty of disclosure to the sellers of target stock. He owed a duty to the offeror corporation not to misuse confidential information entrusted to him. But the term "fraud" in Rule 10b–5 does not bring within the ambit of the rule "all breaches of fiduciary duty in connection with a securities transaction." *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 472, 97 S.Ct. 1292, 1300, 51 L.Ed.2d 480 (1977). In most contexts, "'fraud' still requires something more than 'unfairness' or breach of fiduciary duty." American Law Institute, *Federal Securities Code* (Proposed Official Draft, March 15, 1978) § 1603, Comment (3)(b).

**3.** This case does not involve the prosecution of a "novel or atypical" type of fraud. *See, e. g., United States v. Brown,* 555 F.2d 336 (2d Cir. 1977); *A. T. Brod & Co. v. Perlow,* 375 F.2d 393 (2d Cir. 1967). *Brown* and *Perlow* involved ingenious schemes which, while novel, were clearly fraudulent under any definition of the term fraud. In contrast, Chiarella was prosecuted for trading without disclosing nonpublic,

non-inside information. Failure to make such disclosure is fraudulent only when a duty to disclose is violated. *See General Time Corp. v. Talley Industries, Inc.,* 403 F.2d 159 (2d Cir. 1968), *cert. denied,* 393 U.S. 1026, 89 S.Ct. 631, 21 L.Ed.2d 570 (1969) (permitting company to purchase target stock without disclosing plans for merger); *SEC v. Great American Industries, Inc., supra,* 407 F.2d at 460.

*Section 10(b) as a Criminal Statute.*

If § 10(b) and Rule 10b–5 were broad enough to cover every securities-related maneuver that entailed unfairness or undermined investor confidence there would be no need for all the other statutes and rules that figure in the complex securities regulation scheme that Congress has been building since the 1930's. When a new weak point is identified—such as abuse of regular access to market information by certain participants in the industry—a direct attack on the problem through congressional legislation or SEC rulemaking would be a more appropriate response than the uncomfortable stretching of existing law engaged in by the majority here to cover the gap.[4] The SEC has been aware of the potential for abuse of nonpublic information by financial printers since at least 1971. *SEC v. Sorg Printing Co., Inc.,* C.C.H. Fed. Sec.L.Rep. ¶ 95,034 (S.D.N.Y.1975). The SEC has sought and obtained several consent decrees enjoining the same conduct Chiarella engaged in and ordering disgorgement of profits made in such transactions. *See, e. g., Sorg, supra* ; *SEC v. Ayoub,* C.C.H. Fed.Sec.L.Rep. ¶ 95,567 (S.D.N.Y. 1976); *SEC v. Primar Typographers, Inc.,*

C.C.H. Fed.Sec.L.Rep. ¶ 95,734 (S.D.N.Y. 1976). Apparently the government is of the view that imprisonment will succeed where other sanctions have failed. This may be. But whatever the wisdom of an extension of the "civil incarnation" of § 10(b) to cover the situation presented here, our lawmaking function is severely restricted in the criminal area. As the majority notes, we cannot uphold a conviction unless "a clear and definite statement of the conduct proscribed" antedates the actions alleged to be criminal. Chief Judge Kaufman in *United States v. Persky,* 520 F.2d 283, 287 (2d Cir. 1975), most perceptively identified the novel issue raised by the application of due process-vagueness-notice principles to § 10(b) criminal prosecutions.

> Perhaps the most interesting [issue] is the apparent dissonance between the general rule that criminal statutes are to be strictly construed in favor of the accused · . . · and the realization that the civil incarnations of the anti-fraud provisions have, as remedial legislation, been openly and avowedly construed broadly.

(citations omitted).[5] In *Persky,* this same panel concluded that, as applied to Persky, it could not be said that "the expansive civil

**4.** Because the question is not before us I express no opinion as to whether the SEC has been delegated the power to regulate printers engaged in securities work or whether congressional action is required.

Either the legislative or the administrative process would make possible the imposition of trading restrictions responsive to the different possibilities for abuse of nonpublic information by outsiders as opposed to insiders. Contrary to the majority's statement, unfair advantage over other traders is not the only evil that insider trading restrictions are intended to avoid. The subtle infection of corporate decision-making by considerations of personal gain and other conflicts of interests inimical to the insider's duty to the corporation are also prevented by § 10(b) disclosure requirements, as well as by provisions like § 16 of the 1934 Act (regulating short swing profits). Study of the "market insider" problem and possible cures might yield a mechanism more precisely tailored to prevent the perceived evil without opening the door to those that the Court has not been given the opportunity to consider. For example, the impact, if any, of our decision

on the practice of "warehousing" by tender offerors deserves thought. See, for discussion of warehousing, Fleischer, Mundheim & Murphy, *An Initial Inquiry into the Responsibility to Disclose Market Information,* 121 U.Pa.L. Rev. 798, 811–15 (1973).

**5.** Compare the Supreme Court's cautious and restrictive interpretation of the Sherman Act in a recent criminal price fixing case in light of the fact that "the Act has not been interpreted as if it were primarily a criminal statute" but rather has been construed with great flexibility. *United States v. United States Gypsum Co.,* —— U.S. ——, ——, 98 S.Ct. 2864, 2874, 57 L.Ed.2d 854 (1978). The same accommodation of criminal and remedial sanctions is necessitated by the structure and history of the securities acts. See also *United States v. Winston,* 558 F.2d 105, 108 (2d Cir. 1977), overturning a conviction under the Railway Labor Act: "The paucity of criminal proceedings under [45 U.S.C. § 152], when contrasted with the active pursuit of civil relief thereunder, strongly supports appellants' contention that Congress intended criminal sanctions to apply only to the more egregious violations. Although the fail-

interpretations of Rule 10b–5 have so stretched the Rule that he was not provided fair warning that his conduct was fraudulent by the standard of strict construction due criminal statutes." *Id.* Persky, a securities lawyer and an officer of Microthermal Applications, Inc., engaged in a series of maneuvers, including filing false SEC reports, issuing misleading press releases, and making misrepresentations to Microthermal's shareholders, all calculated to cover up the president's misappropriation of company funds. Not only was Persky an insider owing a clear common law duty to the shareholders of his company, but his actions, designed to use his position of trust to further his own interest at the shareholders' expense, would fall within the most restrictive definition of "fraud." We specifically left open the possibility that § 10(b) might be unconstitutionally vague, in a criminal context, as applied to other behavior when we noted that Persky had no standing to challenge the law "on behalf of those whose conduct would be more ambiguous but who are not before us." *Id.* at 288.

I believe that the "clear and definite statement of the conduct proscribed" to which the majority concedes a defendant is entitled, must emanate from the language of the statute itself, from prior judicial interpretation, or from established custom and usage. Thus I fail to see the relevance to this issue of the warning signs posted by Pandick. While they *would* be most relevant to questions of willfulness, knowledge, or intent, signs posted by a private party can hardly transform conduct otherwise not covered by a particular statute into conduct prohibited by that statute. Under our system only the legislature, not the private citizen, has this power.[6]

The majority has failed to uncover a sufficiently clear statement prohibiting Chiarella's actions to warrant imposition of a criminal sanction.[7] I wholeheartedly endorse the majority's explanation of the desirability and necessity of curbing the ability of those with access to nonpublic information to trade without making disclosure. And I recognize that as a civil, remedial statute § 10(b) has been and should be interpreted in a flexible fashion by the courts. Yet we cannot be deaf to recent caveats issued by the Supreme Court in slowing down the expansion of § 10(b) lest it take over "the whole corporate universe." *Santa Fe Industries, Inc. v. Green, supra,* 430 U.S. at 480, 97 S.Ct. at 1304. We have been urged to turn first to the language of § 10(b) in ascertaining congressional intent. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 197, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). We have been chided for relying on "the term 'fraud' in Rule 10b–5 to bring within the ambit of the Rule all breaches of fiduciary duty in connection with a securities transaction" lest we add a gloss to the statute " 'quite different from its commonly accepted meaning.' " *Santa Fe Industries, Inc. v. Green, supra,* 430 U.S. at 472, 97 S.Ct. at 1300. The brakes have been applied in the context of private causes of action under § 10(b). Surely we should be even more fastidious in our construction of the statute when we are asked to review a

---

ure to enforce a statute over an extended period of time does not result in its repeal, . . . the 'gloss which life has written upon it' . . . indicates in this instance that strict construction of its terms is appropriate." (footnotes and citations omitted).

**6.** Nor would Chiarella's subjective view that his conduct was violative of the securities laws transform his actions, no matter how worthy of condemnation, into conduct criminal under §§ 10(b) and 32(a). *See United States v. Zacher,* 586 F.2d 912, 916–17 (2d Cir. 1978). For the same reason, civil consent decrees, entered into by parties who may want to avoid further litigation for any number of reasons, cannot transform behavior denounced by the SEC into criminal conduct.

**7.** As Chief Judge Kaufman has observed, the "exact nature and scope" of the federal law governing tippee trader liability "remain in a formative stage." *Schein v. Chasen,* 478 F.2d 817, 828 (2d Cir. 1973) (Kaufman, J., dissenting), *vacated on other grounds,* 416 U.S. 386, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974).

criminal conviction. Here, Chiarella was sentenced to a one year term of imprisonment, suspended except for one month, and a five year term of probation.

### Conclusion.

Despite some dicta concerning the purpose behind the securities laws, *see e. g.,* *SEC v. Texas Gulf Sulphur Co., supra,* 401 F.2d at 847–48, "no case has held that there must be parity of material information between the parties to a securities transaction." Fleischer, Mundheim & Murphy, *supra,* 121 U.Pa.L.Rev. at 806. The disclosure duty has been imposed on insiders, broker-dealers, *Chasins v. Smith, Barney & Co.,* 438 F.2d 1167 (2d Cir. 1970), and those undertaking a special relationship with buyers or sellers of stock, *Affiliated Ute Citizens v. United States, supra,* 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741. "The problem in the silence cases is to identify the circumstances which trigger a duty to come forward with information." Fleischer, Mundheim & Murphy, *supra,* 121 U.Pa.L.Rev. at 803. To identify judicially a new triggering circumstance—regular receipt of market information—if appropriate at all, is not appropriate here. The criminal aspects of 10b–5 have been neither extensive nor significant prior to today. 3 Bromberg, *supra,* § 10.3 at 241. The ability of the SEC to function will not be severely hampered if it must await congressional action or action by its own rulemakers to correct any market distortion caused by wayward printers. As would any agency, the SEC would like to keep as many weapons in its arsenal as possible. But there are rules of combat, and our job is to see that the amenities are observed when the SEC embarks on a new crusade.

I would reverse the judgment of conviction and remand with instructions to dismiss the indictment.