UNITED STATES of America, Appellee,

v.

Jerry WINSTON, Broome County Aviation, Inc., Commuter Airlines, Inc., and Theodore (Ted) Bell, Defendants-Appellants.

Nos. 1120, 1121, Dockets 76–1436, 76–1527.

United States Court of Appeals, Second Circuit.

Argued April 5, 1977.

Decided June 23, 1977.

Jay Topkis, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, Marvin Wexler, M. Tracy Sillerman, New York City, of counsel), for defendants-appellants.

Arthur A. Chalenski, Jr., Asst. U. S. Atty., Syracuse, N. Y. (Paul V. French, U. S. Atty., N. D. N. Y., Albany, N. Y., Mark Vogel, Washington, D. C., of counsel), for appellee.

Before KAUFMAN, Chief Judge, VAN GRAAFEILAND, Circuit Judge, and POLLACK, District Judge.*

VAN GRAAFEILAND, Circuit Judge:

Appellants were convicted of violating § 2 of the Railway Labor Act, 45 U.S.C. § 152, which makes it a criminal offense for a railroad or airline to willfully influence or coerce its employees in matters involving unionization or employee representation.[1] Because of errors in the District Court's charge to the jury, we reverse and remand for a new trial.

### The Facts

Appellant Winston is the sole stockholder of appellant Broome County Aviation, Inc., and his wife is the sole stockholder of appellant Commuter Airlines, Inc. Both corporations are located in Binghamton, New York. Broome provides charter service, sells fuel and does aircraft maintenance. Commuter provides scheduled airline service to several nearby cities. Appellant Bell is the chief pilot for the combined operation, which is operated substantially as a single business entity. The company is relatively small in size, employing approximately two dozen pilots, together with the necessary mechanics and ground staff.

In the Fall of 1974, a representative of the pilots contacted the Airlines and Aerospace Employees Union, Teamsters Local 732, to explore the possibility of organizing a pilots' union. At an organizational meeting held on October 2, 1974, a sufficient number of authorization cards were signed to permit the Teamsters to petition the National Mediation Board for an election. The company was opposed to unionization and so indicated in several general meetings with the pilots at which appellants Winston and Bell spoke. Winston also met individually with a number of the pilots, seeking to gain their support. Despite these efforts, three-quarters of the pilots voted for the union, which was certified as the pilots' representative on December 4, 1974. During the months which preceded and followed the election, seven pilots were discharged—two prior to the election and five

---

* Of the Southern District of New York, sitting by designation.

1. Section 152 provides in pertinent part as follows:

  Third. Representatives, for the purposes of this chapter, shall be designated by the respective parties without interference, influence, or coercion by either party over the designation of representatives by the other; and neither party shall in any way interfere with, influence, or coerce the other in its choice of representatives. Representatives of employees for the purposes of this chapter need not be persons in the employ of the carrier, and no carrier shall, by interference, influence, or coercion seek in any manner to prevent the designation by its employees as their representatives of those who or which are not employees of the carrier.

  Fourth. Employees shall have the right to organize and bargain collectively through representatives of their own choosing. The majority of any craft or class of employees shall have the right to determine who shall be the representative of the craft or class for the purposes of this chapter. No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, or to use the funds of the carrier in maintaining or assisting or contributing to any labor organization, labor representative, or other agency of collective bargaining, or in performing any work therefor, or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization, or to deduct from the wages of employees any dues, fees, assessments, or other contributions payable to labor organizations, or to collect or to assist in the collection of any such dues, fees, assessments, or other contributions . . . .

  Tenth. The willful failure or refusal of any carrier, its officers or agents, to comply with the terms of the third, fourth, fifth, seventh, or eighth paragraph of this section shall be a misdemeanor, and upon conviction thereof the carrier, officer, or agent offending shall be subject to a fine of not less than $1,000, nor more than $20,000, or imprisonment for not more than six months, or both fine and imprisonment, for each offense, and each day during which such carrier, officer, or agent shall willfully fail or refuse to comply with the terms of the said paragraphs of this section shall constitute a separate offense. . . .

subsequent thereto. On July 2, 1975, the indictment herein was filed.

Count One charged all of the defendants with an 18 U.S.C. § 371 conspiracy to violate the Railway Labor Act by threatening reprisal if the pilots organized, by asking the pilots for their ballots and by firing a number of them. Winston and the corporate defendants were charged on seven counts with interfering with the pilots' choice of representative and on seven counts with coercing against union membership. Each of these fourteen counts was based upon the discharge of a pilot. Appellants were convicted on all of these counts.

### The Instructions to the Jury

Although Subsection Tenth of 45 U.S.C. § 152 was enacted in 1934, appellants are the first persons who have been tried criminally for violation of its provisions. The District Judge therefore had no helpful precedents to guide him and patterned his charge in the main upon one which would be appropriate in an N.L.R.A. § 8(a)(1) case, 29 U.S.C. § 158(a)(1). Unfortunately, cases decided under § 8(a)(1) do not reach the subject of criminal intent, and it was in this portion of his charge that the District Judge went astray.

Subsection Tenth proscribes "willful" failure to comply with the Act. The District Judge, however, charged the jury that the defendants were not required to know that their conduct violated the Railway Labor Act or any other law. He said that they only needed to be conscious of what they were doing and that their conduct was willful if it was performed knowingly, intentionally, purposefully, or deliberately, wholly or partly for the purpose of thwarting the objects of the law—to prohibit employers from interfering with employees' free exercise of their protected rights to choose a representative, to organize and to bargain collectively with their employer.

The District Judge also instructed the jury that, although the Act does not prohibit an employer from discharging an employee, a discharge motivated wholly or partly by intention to punish the employee or retaliate or discriminate against him for exercising a statutorily protected right is prohibited. He charged that, if an employer knowingly and intentionally discharges an employee partly because of union activities and partly because of misconduct or loss of business, there is nevertheless a violation of the law. He said that, "even if there is otherwise a good and legally sufficient reason or justification for discharging an employee, the employer, nevertheless, violates the law by doing so if an intention to interfere with, influence or coerce an employee in exercising or because he had exercised a protected right, plays any part in the Defendant's motivation." We have concluded that these portions of the charge were prejudicially erroneous.

### Wilfullness Under the Act

The general rule under the common law was that scienter was a necessary element to be proved in every crime. *United States v. Balint*, 258 U.S. 250, 251, 42 S.Ct. 301, 66 L.Ed. 604 (1922). "Actus non facit reum, nisi mens sit rea"[2] is a descriptive quotation which garnished many opinions in the days when such Latin embellishments were the vogue. Although Congress has eliminated the requirement of criminal intent for certain offenses, *see United States v. Park*, 421 U.S. 658, 668, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975), mens rea continues to be "the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence." *Dennis v. United States*, 341 U.S. 494, 500, 71 S.Ct. 857, 862, 95 L.Ed. 1137 (1951). Where an "evil state of mind" is intended to be a prerequisite to guilt, Congress describes it by the use of such terms as "intentional", "willful", "knowing", "fraudulent" or "malicious". *Morissette v. United States*, 342 U.S. 246, 264, 72 S.Ct. 240, 96 L.Ed. 288 (1952).

When used in a criminal statute, "[willful] generally means an act done with a bad purpose . . . without justifiable excuse . . . stubbornly, obstinately, per-

---

**2.** "An act does not make one guilty unless his mind is guilty."

versely . . . ." *United States v. Murdock*, 290 U.S. 389, 394, 54 S.Ct. 223, 225, 78 L.Ed. 381 (1933) (citations omitted). "An evil motive to accomplish that which the statute condemns becomes a constituent element of the crime." *Screws v. United States*, 325 U.S. 91, 101, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945). In short, the defendant's conduct must constitute a "voluntary, intentional violation of a known legal duty." *United States v. Pomponio*, 429 U.S. 10, 12, 97 S.Ct. 22, 23, 50 L.Ed.2d 12 (1976). Although Congress has, in *malum prohibitum* offenses, sometimes equated willfulness with purposefulness and awareness, as distinguished from negligence or inadvertence, *United States v. Ricciardi*, 357 F.2d 91, 99–100 (2d Cir., *cert. denied*, 384 U.S. 942, 86 S.Ct. 1464, 16 L.Ed.2d 540 (1966), we are satisfied that such was not its intention in this instance.

At a hearing on the proposed § 152 amendments held before the Senate Committee on Interstate Commerce on April 12, 1934, a railroad representative objected to the penalty provisions of Subsection Tenth. Responding to these objections, Joseph B. Eastman, Federal Coordinator of Transportation, testified on April 19, 1934 as follows:

> Mr. Clement is much concerned about this penalty provision, and thinks it would require the presence of attorneys in negotiations between the men and the managements, in order that the railroad officers might have the safeguard of legal advice at all times. There would be no such need.

> · · · · ·

> To abate Mr. Clement's alarm further, he should note that the penalty para-

graph contains the word "willful." Experience has shown that it is a difficult matter to secure a conviction with that word in a statute and requires an array of most convincing evidence. If he will read the prohibitions to which they apply, I am sure that he will conclude that he can safely brave the dangers of these penalties without a lawyer constantly at his elbow to give him advice.

When questioned by the Committee Chairman as to whether without excising Subsection Tenth as Mr. Clement had recommended, something might be added "to show the liberal intent of Congress", Mr. Eastman pointed to the word "willful" and stated that "you have to have a most convincing presentation of evidence to secure conviction with it in there."

■ The paucity of criminal proceedings under § 152, when contrasted with the active pursuit of civil relief thereunder,[3] strongly supports appellants' contention that Congress intended criminal sanctions to apply only to the more egregious violations. Although the failure to enforce a statute over an extended period of time does not result in its repeal, *District of Columbia v. John R. Thompson Co.*, 346 U.S. 100, 113–14, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953), the "gloss which life has written upon it", *Nashville, Chattanooga & St. Louis Ry. v. Browning*, 310 U.S. 362, 369, 60 S.Ct. 968, 972, 84 L.Ed. 1254 (1940), indicates in this instance that strict construction of its terms is appropriate. *Cf. James v. United States*, 366 U.S. 213, 221, 81 S.Ct. 1052, 6 L.Ed.2d 246 (1961).[4]

---

3. *See, e. g., Texas & New Orleans R.R. v. Brotherhood of Ry. Steamship Clerks*, 281 U.S. 548, 50 S.Ct. 427, 74 L.Ed. 1034 (1930); *Conrad v. Delta Airlines, Inc.*, 494 F.2d 914 (7th Cir. 1974); *Burke v. Compania Mexicana De Aviacion, S. A.*, 433 F.2d 1031 (9th Cir. 1970); *Nat'l Airlines, Inc. v. Int'l Ass'n of Machinists & Aerospace Workers*, 430 F.2d 957 (5th Cir. 1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 456, 27 L.Ed.2d 440 (1971); *Cunningham v. Erie R.R.*, 358 F.2d 640 (2d Cir. 1966).

4. Some legal scholars maintain that a preexisting and protracted failure to enforce a statute

creates due process problems analogous to those arising from vagueness in draftsmanship, because of the lack of fair notice or warning to the individual charged with its violation. *See, e. g.*, Bonfield, *The Abrogation of Penal Statutes by Nonenforcement*, 49 Iowa L.Rev. 389, 415–18 (1964); *see also United States v. Insco*, 496 F.2d 204, 208–09 (5th Cir. 1974). Because we conclude that the history of nonenforcement supports the interpretation urged by appellants, we need not concern ourselves with that argument.

Insofar as the charge of criminal conspiracy is concerned, the provisions of the First Amendment lead to the same conclusion. Appellants were charged in the conspiracy count, not only with improper conduct, but also with illegal speech. Although the Supreme Court held in *N. L. R. B. v. Gissel Packing Co.*, 395 U.S. 575, 616–620, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969) that the First Amendment does not preclude restrictions on employers' speech which constitutes an unfair labor practice, NLRA cases such as *Gissel* involve civil penalties imposed by experienced labor officials having specialized expertise in the field. *See Radio Officers' Union v. N. L. R. B.*, 347 U.S. 17, 49, 74 S.Ct. 323, 98 L.Ed. 455 (1954). Here, a lay jury was asked to make an admittedly difficult analysis of the employer's language, *see N. L. R. B. v. Yokell*, 387 F.2d 751, 756 (2d Cir. 1967), to determine whether a crime had been committed. *See United States v. DeLaurentis*, 491 F.2d 208, 213 (2d Cir. 1974). Accordingly, the statute which appellants are alleged to have violated had to be carefully construed so as not to infringe upon their right to protected expression. *Gooding v. Wilson*, 405 U.S. 518, 522, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972); *Smith v. California*, 361 U.S. 147, 151, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959). Assuming that statutory impreciseness permitted free choice between strict and liberal definition of the term willful, the trial court was bound to opt for the one which accomplished the statutory purpose with the less drastic impact on First Amendment freedoms. *United States v. Robel*, 389 U.S. 258, 268, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967).

Examination of the term willful in the context of this case, *see United States v. Bishop*, 412 U.S. 346, 356, 93 S.Ct. 2008, 36 L.Ed.2d 941 (1973), leads us to the conclusion that more was required to establish appellants' mens rea than mere consciousness, intention and awareness of what they were doing. They must be found to have acted voluntarily and intentionally to violate a known legal duty. *United States v. Pomponio, supra*, 429 U.S. at 12, 97 S.Ct. 22; *United States v. Bishop, supra*, 412 U.S. at 360, 93 S.Ct. 2008. The District Court's failure to so charge was error.

### Motivation for Discharge of Employees

■ In drawing upon civil cases from the labor relations field for his charge on employer motivation, the District Judge chose those statements of the law which most rigidly circumscribe the employer's freedom of choice. He instructed the jury that the employer was guilty if an intention to coerce played "any part in the Defendant's motivation". Language of this import can be found in our NLRA decisions. *See, e. g., N. L. R. B. v. Milco, Inc.*, 388 F.2d 133, 138 (2d Cir. 1968). We have also said, however, that the issue was "whether the dismissal was in significant part motivated by proscribed [conditions]." *N. L. R. B. v. D'Armigene, Inc.*, 353 F.2d 406, 409 (2d Cir. 1965).

■ Whatever may be the proper rule in a civil case it must be applied with circumspection where a criminal violation is charged. *United States v. Bernstein*, 533 F.2d 775, 805–06 (2d Cir. 1976) (Van Graafeiland, *J.*, dissenting), *cert. denied*, 429 U.S. 998, 97 S.Ct. 523, 50 L.Ed.2d 608 (1976). "In no one thing does criminal jurisprudence differ more from civil than in the rule as to intent." J. Bishop, Bishop on Criminal Law, Vol. I, § 286, at 192 (9th ed. 1923). The Railway Labor Act was not intended to interfere with the normal right of an employer to hire and fire, *Texas & New Orleans R.R. v. Brotherhood of Railway & Steamship Clerks*, 281 U.S. 548, 571, 50 S.Ct. 427, 74 L.Ed. 1034 (1930), and appellants have produced substantial evidence in support of their contention that each of the discharged employees was dismissed for a sound business reason. As a general rule, justification under the criminal law means that the defendant had a sufficient lawful reason for acting. *Townsend v. United States*, 68 App.D.C. 223, 95 F.2d 352, 358, *cert. denied*, 303 U.S. 664, 58 S.Ct. 830, 82 L.Ed. 1121 (1938). Conduct which is justified is legal conduct. *United States v. Barker*, 168 U.S.App.D.C. 312, 514 F.2d 208, 230 (Bazelon, *C. J.*, concurring), *cert. denied*, 421 U.S. 1013, 95 S.Ct. 2420, 44

L.Ed.2d 682 (1975). Indeed, there is strong support for the argument that, once justification has been established, motivation is immaterial. See W. LaFave and A. Scott, Jr., Handbook on Criminal Law 206 (1972); J. Miller, Handbook on Criminal Law 213 (1934); Robinson, *A Theory of Justification*, 23 U.C.L.A.L.Rev. 266, 284–87 (1975).

The Supreme Court has had occasion to consider the question of dual motivation in two recent cases. In *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 270–271 n. 21, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Court stated that proof that the denial of a rezoning request was motivated in part by a racially discriminatory purpose did not entitle plaintiffs to recover. The issue, according to the Court, was whether the same decision would have been reached had the impermissible purpose not been considered. "If this were established", the Court said, "the complaining party in a case of this kind no longer fairly could attribute the injury complained of to improper consideration of a discriminatory purpose." In *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 285, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977), where plaintiff, a teacher, alleged that he was illegally discharged because of conduct which was constitutionally protected, the Court again concluded that the issue was whether the Board "would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct."

We conclude that the proper test by which the legality of the defendants' conduct should have been determined in the instant case was whether they "would have reached the same decision as to [their employees' discharge] even in the absence of the protected conduct." The jury should have been instructed that, if legitimate reasons existed which justified the discharge, the defendants could not be held criminally liable under the Act unless the government has proved that the legitimate reasons alone would not have led to the discharge. The District Court's instructions concerning partial improper motivation and partial improper intent were confusing and improper and therefore prejudicially erroneous. *Cf. Mt. Healthy City School District Board of Education v. Doyle, supra,* 429 U.S. at 287, 97 S.Ct. 568.

In reaching our decision to direct a new trial, we are not unmindful of the difficulties which confronted the District Judge in this case of first impression. His problems were not made easier by the failure of defense counsel to take appropriate exceptions. The doctrine of plain error nonetheless mandates reversal. *Screws v. United States, supra,* 325 U.S. at 107, 65 S.Ct. 1031; *United States v. Byrd,* 352 F.2d 570, 574 (2d Cir. 1965). In the event the Government sees fit to retry this case, appropriate objection by defense counsel may obviate other alleged errors of lesser import which have been asserted for the first time in this Court. We see no need to consider their merit on this appeal.

Reversed and remanded.