Charles **ADAMS,** Larry **Washington, George Andrews, Billy Lovett, and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Plaintiffs,**

v.

**FEDERAL EXPRESS CORPORATION, Defendant.**

**Civ. No. C–75–141.**

United States District Court, W. D. Tennessee, W. D.

April 26, 1979.

Howard R. Paul, Memphis, Tenn., Robert M. Baptiste, Roland P. Wilder, Jr., Gary S. Witlen, Washington, D. C., for plaintiffs.

Scott F. May, Watson, Cox, Arnoult & May, Memphis, Tenn., for defendant.

## MEMORANDUM DECISION

BAILEY BROWN, Chief Judge.

This action was filed on April 4, 1975 by two of the individual plaintiffs and the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (hereinafter "Teamsters"). Subsequently, two other individual plaintiffs were added. The suit arose in conjunction with an organizing effort by the Teamsters at defendant's Memphis facility. Plaintiffs allege that defendant unlawfully interfered with and coerced its employees in connection with the selection of a collective bargaining representative in violation of § 2 (Third) and (Fourth) of the Railway Labor Act, 45 U.S.C. § 152 (Third) and (Fourth).[1] Defendant is a carrier by air and thus is covered by § 2 of the Railway Labor Act as provided in 45 U.S.C. § 181.

Plaintiffs Charles Adams, Larry Washington and George Andrews were all discharged by defendant in the early part of 1975. They claim they were unlawfully discharged because of their union activities, and seek reinstatement, back pay and restored seniority. Plaintiff Billy Lovett was transferred between departments in early 1975, shortly before he was scheduled to go into military service. He claims that he was transferred because of his union activities. He has since been reinstated in his previous job, but seeks any back pay and seniority rights which he would have received had he never been transferred. In addition, all plaintiffs seek to have this court enjoin defendant from doing a number of things connected with union activity including: (1) threatening employees, (2) interrogating employees, (3) engaging in surveillance of employees, (4) discharging or transferring employees, (5) withholding promised benefits, and (6) conferring additional benefits.

On September 10, 1975, we entered an order denying plaintiffs' request for a preliminary injunction and dismissing the claims of the Teamsters. We dismissed the Teamsters as a plaintiff because we concluded that an uncertified labor union does not have standing to bring an action under the Railway Labor Act. Our order was affirmed in its entirety by the U. S. Court of Appeals for the Sixth Circuit, leaving only the individual claims for resolution. *Adams v. Federal Express Corporation,* 547 F.2d 319 (6th Cir. 1976), *cert. denied,* 431 U.S. 915, 97 S.Ct. 2177, 53 L.Ed.2d 225 (1977). The Sixth Circuit further concluded that this court had jurisdiction of claims under 45 U.S.C. § 152 (Third) and (Fourth) without requiring plaintiffs to present them first to the National Mediation Board. *Id.,* at 321. We note at the outset that this court has the power to grant the relief sought. The Railway Labor Act implicitly authorizes this court to award back pay and reinstatement in an appropriate case. *Burke v. Compania Mexicana de Aviacion, S. A.,* 433 F.2d 1031 (9th Cir. 1970); *Griffin v. Piedmont Aviation, Inc.,* 384 F.Supp. 1070 (N.D.Ga.1974). This court also has the authority to enjoin an employer from violat-

---

1. Section 152 (Third) of Title 45 prohibits "interference, influence, or coercion by either party [i. e. carrier or employees] over the designation of representatives." Section 152 (Fourth) provides:

No carrier, its officers, or agents shall deny or in any way question the right of its employees to join, organize, or assist in organiz-

ing the labor organization of their choice, and it shall be unlawful for any carrier to interfere in any way with the organization of its employees, . . . or to influence or coerce employees in an effort to induce them to join or remain or not to join or remain members of any labor organization . . . .

ing the provisions of the Act at issue here. *Texas & New Orleans Railroad Company v. Brotherhood of Railway & Steamship Clerks,* 281 U.S. 548, 567–570, 50 S.Ct. 427, 74 L.Ed. 1034 (1930). If any of the individual plaintiffs are entitled to relief, then we believe it would be within this court's power to grant the additional injunctive relief necessary to prevent any further coercion of their rights to select a bargaining representative under the Act.[2] We now turn to the claims of the individual plaintiffs. We first will address their prayers for individual relief and then will address their prayers for general injunctive relief.

## I. *Plaintiff Charles Adams*

Plaintiff Charles Adams was employed by defendant from September 23, 1974 until March 12, 1975 to perform janitorial and building maintenance work. It is undisputed that Adams' discharge on March 12 was precipitated by his failure to remove a "Go Teamsters" button after being ordered to do so by Tucker Taylor who was then Senior Vice President for Industrial Relations. Adams contends that he was entitled to wear the button and that his discharge for failure to remove the button amounted to coercion in the choice of a bargaining representative in violation of the Railway Labor Act. Defendant counters that Adams was subject to immediate discharge for insubordination pursuant to company policy (Ex. 22, p. 15) and that, in any event, his refusal to remove the button amounted to a third disciplinary infraction which also authorized his discharge under company policy (Ex. 22, p. 16). Adams' previous two reprimands involved tardiness to and absences from work (Ex. 2, pp. 1–3). Defendant further contends that there was good reason to order Adams to remove his button, independent of the fact that the button displayed support for the Teamsters, in that there was a danger that a loose metal object could cause foreign object damage to defendant's jet aircraft engines by being sucked into one of them.

Despite all of the testimony about the foreign object damage that a metal button could cause to an aircraft, it is clear that this was not the reason that Vice President Taylor ordered Adams to remove his button. Taylor candidly testified that he told Adams to remove the button because he felt that it was "inflammatory," that it would be disruptive to other employees, and that it would offend defendant's investors, lenders and directors who were on the premises that day. (Tr. 997–998.) Taylor further stated that he did not mention any potential foreign object damage to Adams. (Tr. 1006–1007.) The fact that Taylor was concerned about the button being "disruptive" and not about foreign object damage is confirmed by his memorandum of March 13, 1975 in which he described his conversation with Adams. (Ex. 2, p. 4.) In fact, Taylor acknowledged that he would not have asked Adams to remove a "Church of Christ" button because such a button would not have been as controversial. (Ex. 2, p. 4; Tr. 999, 1005.) We find, therefore, that Taylor ordered Adams to remove his "Go Teamsters" button solely because Taylor felt it was inflammatory.

We conclude that Taylor's order to Adams to remove the Teamster button and Adams' subsequent discharge for refusing to remove the button unlawfully coerced Adams and other employees in their selection of a bargaining representative in violation of § 152 (Third) and (Fourth). We reach this conclusion because the admitted purpose of Taylor's order was to cover up visible expressions of support for the Teamsters simply because such expressions of support might be "disruptive" or "inflammatory." We believe that employees have the right to visibly demonstrate their support or opposition to a particular bargaining

2. We note that, after this lawsuit was filed, a certification election was held for the class of Mechanics and Related Employees at Federal Express. Following that election, the National Mediation Board found no basis for certifying the Teamsters as bargaining representative.

*Adams, supra,* at 324–325. This fact would not preclude us, however, from enjoining defendant from violating its employees' organizational rights in the future if we determine that past violations have occurred.

representative absent some exceptional reason for curtailing such expression. Here, the suggested reason of potential foreign object damage was clearly an afterthought and was not the basis of the order or the decision to terminate Adams.

■ Although very few cases interpreting the Railway Labor Act have dealt with the kinds of activity that may be found coercive under § 152, our conclusion is buttressed by cases interpreting § 8(a)(1) and (3) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1) and (3). Those provisions of the NLRA prohibit an employer covered by that Act from interfering with, restraining, or coercing employees in the exercise of their organizational rights and from "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." While employers covered by the Railway Labor Act are not subject to the provisions of the NLRA, the NLRA and cases interpreting it nevertheless provide some guidance in the interpretation of certain provisions of the Railway Labor Act. *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 383, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969), *reh. denied,* 394 U.S. 1024, 89 S.Ct. 1622, 23 L.Ed.2d 51 (1969)

The right of employees to wear union insignia, including buttons, has long been protected under the NLRA, and discharge of employees for wearing such insignia normally is held to violate 29 U.S.C. § 158(a)(1) and (3). *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 802–803, 65 S.Ct. 982, 89 L.Ed. 1372 (1945); *Larand Leisurelies, Inc. v. NLRB,* 523 F.2d 814, 818–819 (6th Cir. 1975). The Sixth Circuit has carved out an exception to this rule "where there are 'special considerations relating to employee efficiency and plant discipline.'" *Larand Leisurelies, supra* at 819. Defendant has not demonstrated that the wearing of Teamster buttons made its operation any less effi-

cient and, despite Taylor's belief that the buttons were "disruptive," defendant has not demonstrated that any disciplinary problems were attributable to the buttons.

■ Adams' discharge cannot be justified by the mere fact that he may have been guilty of "insubordination" or that he had two reprimands in his file pertaining to unrelated subjects. An employee is under no obligation to obey an order that unlawfully coerces him in the exercise of his rights under § 152, and he cannot lawfully be discharged for his failure to obey such an order. Adams was clearly discharged because of his refusal to obey an unlawful order and for no other reason.

Accordingly, we conclude that Taylor's order directing Adams to remove his Teamsters button and Adams' subsequent discharge violated 45 U.S.C. § 152 (Third) and (Fourth). We therefore conclude that Adams is entitled to reinstatement with complete seniority rights and back pay to March 12, 1975.

## II. *Plaintiff Larry Washington*

Plaintiff Larry Washington was employed in the "hub" of defendant's operation from February 21, 1974 until February 7, 1975 [3] as a sorter and loader of packages shipped by defendant. It is undisputed that Washington's discharge was actually precipitated by an incident in the restroom while Washington was at work. Defendant contends that Washington was justifiably discharged for sleeping in the restroom following a series of reprimands regarding the quality of his work. Washington, on the other other, maintains that his discharge and his previous reprimands were merely pretextual in that defendant really wanted to get rid of him because of his union activity.

■ In construing the Railway Labor Act, the U. S. Court of Appeals for the Seventh Circuit has said:

---

**3.** In his testimony, Washington said he began work February 29, 1974 and was discharged February 14, 1975. (Tr. 352.) However, de-

fendant's employee records regarding Washington reflect the dates used in the text (Ex. 1), and we choose to follow these.

A claim of discharge in violation of § 152 raises the question of the employer's motivation. Anti-union motivation invalidates even a discharge which could be justified on independent grounds.

*Conrad v. Delta Air Lines, Inc.,* 494 F.2d 914, 918 (7th Cir. 1974). This same standard has been applied to determine whether a discharge violates § 8(a)(1) and (3) of the NLRA, 29 U.S.C. § 158(a)(1) and (3). *NLRB v. J. P. Stevens Co., Inc.,* 563 F.2d 8, 20 (2d Cir. 1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1240, 55 L.Ed.2d 765 (1978); *Allen v. NLRB,* 183 U.S.App.D.C. 83, 89, 561 F.2d 976, 982 (1977). Thus, even if Washington might have lawfully been discharged for some other reason, he is entitled to relief if his union activities played any part in his termination.

■ Washington testified that he was feeling ill on the morning that he was terminated. (Tr. 366.) There is some dispute as to whether or not he asked his supervisor, Nelson Johnson, for permission to go home, but in any event he continued to work his shift. After he had finished loading the flight on which he was working, Washington went into the restroom. Supervisor Johnson testified that there was nothing wrong with Washington using the restroom at that particular time in between flights. (Tr. 583.) However, Johnson further testified that he missed Washington and went into the restroom to look for him. (Tr. 558.) Johnson stated that Washington immediately jumped up and flushed the toilet. (Tr. 558.) Johnson said he then went back outside the restroom and waited to see if Washington would come out. (Tr. 559.) When Washington failed to emerge, Johnson testified that he went back into the restroom with another supervisor, Rudy Myles, and that they peeked into the stall and saw Washington asleep with his pants up and legs crossed on the toilet seat. (Tr. 560.) Johnson testified that he then left the restroom and told Ron Van, who was hub manager at that time, that Washington was sleeping on the job. (Tr. 560.) Van testified that he waited a while before he went into the restroom where he found Washington asleep with his pants up and

feet on the floor. (Tr. 707, 709, 725, 729). Van stated that he climbed onto the toilet in the adjoining stall and pounded on the wall to wake up Washington. (Tr. 726.) Everyone agrees that Van took Washington back to his office and immediately terminated him. Washington disputed the contention that he was asleep in the restroom and testified that he was using the toilet in a normal fashion when Manager Van came in. (Tr. 392–394.) We find that Washington's discharge was caused by his being found asleep on the job when he was needed for work and that his discharge was therefore justified.

It should be pointed out that Washington himself stated that he was not discharged *solely* for his union activities but also because of Van's continued animosity toward him. (Tr. 376.) Washington had had several previous run-ins with Van before the morning of his termination. On November 2, 1974, Van discharged Washington ostensibly because of Washington's failure to load first priority packages before second priority packages. (Ex. 1, pp. 3–4; Tr. 702–704.) However, Washington appealed to Van's superior, Roger Larson, and Washington was reinstated three days later. (Ex. 1, p. 5; Tr. 358, 704–705.) Following this incident, Washington testified that Van was antagonistic toward him. (Tr. 359.) Then on February 3, 1975, Van demoted Washington from his status as team captain because Washington had missed a package which should have been loaded before other packages. (Ex. 1, pp. 6–7; Tr. 705–706.) Van reported that he told Washington that he should probably fire Washington at that time, but that he would give Washington one more chance. Four days later, Washington was terminated as a result of the restroom incident.

### III. *Plaintiff George Andrews*

Plaintiff George Andrews was employed as a welder in defendant's engine shop from September 25, 1973 until April 10, 1975, when he was discharged. Andrews contends that he was discharged for his union activity. Defendant contends that An-

drews was discharged because he failed to report to work on April 9, 1975 without notifying his superior as required by company policy. (Ex. 22, pp. 10–11.) Defendant contends that this was Andrews' fourth violation of this nature, which subjected him to termination. (Ex. 22, p. 16.)

As indicated in our discussion of plaintiff Washington, if Andrews can show that his discharge was partially motivated by anti-union sentiment, he is entitled to relief even if there were other justifiable reasons for his discharge. *Conrad, supra*, at 918. It is clear that defendant's management knew about Andrews' union activity at the time he was fired. (Tr. 292–300, 847.) Indeed, defendant's director of maintenance, Fred Buechling, acknowledged that he had discussed the union organization drive with Andrews. (Tr. 847.)

It is our finding, however, that Andrews was discharged for entirely legitimate reasons that had nothing to do with his union activity. Andrews testified that his union activity began in February, 1975. By that time, Andrews already had received three reprimands for failing to report to work without calling in on time. (Ex. 3, pp. 3, 4, 6.) On two of those occasions, Andrews reportedly did not call in at all and, on the third occasion, he reportedly called in at noon instead of two hours before the beginning of his shift as required by company policy. For the last of these three violations, Andrews was suspended for three days without pay. (Ex. 3, p. 4; Tr. 320–321.) In addition, the written memorandum from the engine shop manager at the time of the third violation, Larry Streiber, to Andrews stated: "If this situation occurs again or if you violate any other company policies, you will receive further disciplinary action, *up to and including discharge.*" (Ex. 3, p. 4. Emphasis added.) Andrews acknowledged that he received that letter. (Tr. 320.) Andrews further acknowledged that he did not believe union activity had anything to do with these first three reprimands since he did not begin his involvement with the union until one month *after* the third reprimand. (Tr. 327–328.) An-

drews admitted that he failed to report to work on April 9, 1975 and that he failed to call in. Since he had been reprimanded three times for similar violations before beginning his union activity and since he had been warned in the last reprimand that any future violations might result in termination, we find that Andrews was discharged for continually violating company policy and not for any union activities.

In seeking to demonstrate that anti-union animus was really the cause of his discharge, Andrews relies in part on the fact that Engine Shop Manager Streiber, who signed two of the reprimands, was transferred because of his inability to get along with the employees in the shop. (Tr. 299, 896.) Apparently it is Andrews' theory that the company knew that any reprimands issued by Streiber were unreliable, and therefore defendant's use of these reprimands to justify firing Andrews leads to the inference that he was fired for his union activity. We find this reasoning unpersuasive. It seems obvious that every decision made by Streiber during his tenure as shop manager does not become a nullity simply because he was transferred for poor employee relations. Andrews admits that he repeatedly violated company policy, and on something as clear-cut as this, we see no reason why defendant should have questioned Streiber's decision that these reprimands were appropriate.

In addition, Andrews stated that it was impossible to comply with defendant's policy of calling in sick two hours before the beginning of his shift because his shift began at 7:00 a. m. and no one was at the switchboard at 5:00 a. m. (Tr. 322.) It may be true that this policy was unreasonable as applied to Andrews. However, he was aware that he was being required to comply with this policy when he received his three reprimands. There is no indication that Andrews made any effort to complain to defendant that the policy should not apply to someone on his shift. The fact that he was discharged for a fourth violation of this policy cannot be attributed to his union activity no matter how unreasonable he felt the policy was in his case.

Andrews next contends that several employees in other departments had worse absentee records than he did and yet were not fired. He again asks the court to infer from this that he was fired for his union activities. Maintenance Director Buechling admitted that there were several employees with bad absentee records who had never been terminated or even suspended. (Tr. 901; Ex. 10.) However, there is no evidence that these other employees were in the same department or division as Andrews, that their supervisors applied the policies as strictly as Andrews' supervisors did, or that they had failed to call in as required. We cannot conclude that Andrews' firing was pretextual merely because some employees in other departments dealing with different supervisors may have been treated differently.

Finally, Andrews has failed to show that he was involved in any great upsurge of union activity during the days immediately preceding his discharge. It is true that the complaint in this case was filed April 4, 1975, but Andrews was not a plaintiff at that time. Andrews was an active participant at a union meeting on March 9, 1975, and at a meeting between engine shop employees and management on March 10. (Tr. 295–298.) It is hard to believe, however, that Andrews was fired in April for his role in these meetings in March, since management apparently thought the employee complaints were justified enough to have Engine Shop Manager Streiber removed the same day that the engine shop meeting was held. (Tr. 300.)

Accordingly, we find that plaintiff Andrews was discharged for violating defendant's policy regarding absenteeism and not for any union activity. He is therefore not entitled to any relief.

## IV. *Plaintiff Billy Lovett*

Plaintiff Billy Lovett first became employed by defendant in August, 1972 as an apprentice mechanic. By all accounts, he was an extremely capable mechanic and quickly progressed to a lead mechanic position. Unlike the other three plaintiffs, Lovett is still employed by defendant. The gravamen of Lovett's complaint is that he was transferred against his will around March 10, 1975 because of his union activities. Lovett, who has returned to his preferred job of lead mechanic, seeks back pay and restoration of the department seniority that he lost as a result of the transfer. (Tr. A–9–10.)[4]

The circumstances surrounding Lovett's transfer began around January or February of 1975 when he informed defendant that he was going to enlist for a four-year term in the Air Force. (Tr. 103, 110.) Lovett was due to enter the Air Force on April 28, 1975. (Tr. 127.) It is undisputed that Maintenance Director Buechling and Edward Worthington, manager of hangar and line maintenance, called Lovett into Worthington's office on March 10, 1975 and told him that they wanted to transfer him to the Training Department to help set up a training course for lead mechanics. (Tr. 100–101, 848–849.) Lovett said they told him he had no choice in the matter. (Tr. 101.) This was corroborated by Buechling and Worthington. (Tr. 882–883, 933.) Despite the fact that the transfer was considered by management to be a promotion because Lovett was to be paid a salary instead of an hourly wage, Lovett resisted the transfer. (Tr. 102.) Lovett finally decided to accept the transfer after several discussions with Buechling. (Tr. 107–110.) Lovett was apparently persuaded primarily by the company's argument that he would needlessly keep others from being promoted if he remained in the lead mechanic's position when he was needed elsewhere. (Tr. 109.) This point was reiterated in a memorandum sent to Lovett by Vice President Tucker Taylor. (Ex. 17.)

Lovett did spend the next month and a half in the Training Department before leaving the company as scheduled on April 28, 1975. (Tr. 127.) Less than a month after leaving the company, Lovett applied

---

4. Portions of the transcript designated by the letter "A" refer to the additional testimony taken at the subsequent hearing in this case on August 23, 1978.

for a hardship discharge from the Air Force due to the illness of his father. (Tr. 111.) After some initial uncertainty as to whether or not Lovett would be reemployed at Federal Express, he returned to work there around August 1, 1975 following receipt of his official discharge. (Tr. A–7–8.) He was placed back in the Training Department at the same salary, and produced several training manuals. (Ex. A–3; Tr. A–8, A–29–34.) On March 29, 1976, Lovett was transferred back to the Maintenance Department as a mechanic at his request. (Tr. A–34–35.) He started at the bottom of the pay scale for a mechanic, but by December 12, 1976, he was paid at the top of the scale for senior mechanics. (Tr. A–36–38.) On August 29, 1977, Lovett was promoted back to lead mechanic (Tr. A–40), which was the position he held when he was transferred to the Training Department in March of 1975. He is now paid as well as any other lead mechanic in the Maintenance Department. (Tr. A–40.) He ranks sixth in department seniority, when he would have ranked first in seniority had he never been transferred. (Tr. A–41.) This reduced seniority affects his right to bid for desired shifts, but does not affect his rate of pay. (Tr. A–41–42.)

 The sole question to be decided in conjunction with Lovett's prayer for individual relief is whether or not he was unlawfully transferred because of his union activity.[5] As with a discharge, an employer is free to transfer an employee for any reason as long as there is no statutory or contractual bar. However, any transfer which is based in part on an employee's union activity must be held unlawful. See *NLRB v. Varo, Inc.*, 425 F.2d 293, 301 (5th Cir. 1970).

As the court noted at the close of the 1975 hearings, Maintenance Director Buechling admitted that one reason for Lovett's transfer was to isolate Lovett from his fellow employees because of his union activity. (Tr. 851–852.) Buechling further

testified that he considered Lovett a "disruptive force" in the maintenance department. (Tr. 890.) Moreover, there is additional evidence that Lovett's transfer to the Training Department a month and a half before his scheduled departure for the Air Force was pretextual. Anthony Franzolino, the director of training, testified that by the time Lovett himself had completed the introductory training program necessary for his work in the Training Department, his date of departure had arrived. (Tr. 929.) Franzolino further testified that such an introductory program normally takes six months—far in excess of the month-and-a-half that Lovett was scheduled to work in the department. (Tr. 927.) In addition, if an employee gives notice that he is going to leave shortly, it strikes the court that the normal response of the employer would be to let him finish in the job he had been doing rather than transfer him to something brand new. We further find that defendant's argument to Lovett that he was keeping other employees from being promoted is suspect in view of the fact that Lovett was going to leave at the end of April anyway. It certainly would not have made that much difference to the other employees if their promotions had come seven weeks later. There is also the testimony of three witnesses, unrefuted during the hearings on this matter, that Senior Vice President Jim Riedmeyer told employees at a meeting that Lovett was transferred because of his union activity. (Tr. 71, 104–105, 205.) Finally, there is testimony that the transfer occurred at the same time employees began wearing Teamster buttons to work. (Tr. 100–101.) Indeed, the transfer occurred only two days before plaintiff Charles Adams was discharged for refusing to remove his button and only a day after the union meeting on March 9.

Defendant attempts to counter this evidence by demonstrating that Lovett was free to wander around company property and talk to employees after the transfer.

---

5. During the 1975 hearings, Lovett was also contending that he was prevented from coming back to work for defendant because of his union activities. Since he did return to work for defendant shortly thereafter, however, we do not believe this remains as an issue in this case.

(Tr. 917.) However, Buechling testified that Lovett's freedom in his new position was "supposed to be restricted" even if it did not work out that way. (Tr. 855.) In sum, we find the evidence overwhelming that plaintiff Lovett was transferred because of his union activity.

Defendant further appears to argue that, even if this is true, the transfer was nevertheless justified because Lovett was soliciting for the union on company time. (Tr. 851–852.) However, Buechling testified that he had no personal knowledge of what Lovett was doing on company time, only reports from supervisors. (Tr. 892.) Manager Worthington testified that the employee who replaced Lovett as lead mechanic following Lovett's transfer had previously complained about Lovett spending too much working time soliciting for the union. (Tr. 934.) However, this is also indirect evidence, since the employee did not testify himself. In short, there is no direct evidence that Lovett in fact engaged in solicitation on company time.

■ Even if Lovett did solicit on company time, however, there is no evidence that he violated any company rule by doing so. It is now well settled that an employer has a *right* to promulgate a no-solicitation rule during working hours. *Republic Aviation Corp., supra,* 324 U.S. at 803 n. 10, 65 S.Ct. 982; *Jeannette Corp. v. NLRB,* 532 F.2d 916 (3d Cir. 1976). However, in the absence of such a rule, we cannot hold that a transfer for soliciting on behalf of the union on company time is justified. This is particularly true in view of Worthington's testimony that he never complained to Lovett about Lovett's purported solicitation on company time even though, according to Worthington, Lovett's job performance deteriorated. (Tr. 955–956.)

The truth of the matter is that Lovett, who had been a national merit scholar in high school and had shown great aptitude for mechanical work on defendant's jet aircraft, was in line to move up into management with a bright future in that area, and management could not fathom why Lovett would forfeit this opportunity by becoming active in the Teamsters' effort to organize defendant's employees. In short, from management's point of view, Lovett was bent on not rising into management, which management did not understand and resented. However, this was Lovett's choice and management could not properly transfer him or in any way punish him for his union activity.

For all these reasons, we conclude that plaintiff Lovett was unlawfully transferred on March 10, 1975 because of his union activities in violation of 45 U.S.C. § 152 (Third) and (Fourth). Accordingly, Lovett is entitled to the full department seniority he would have had if he had never been transferred. Furthermore, Lovett is entitled to any back pay lost as a result of the transfer, although this might be difficult for him to demonstrate in view of the amount he was paid while he was in the Training Department.

## V. *Other Injunctive Relief*

■ In addition to the individual relief sought by plaintiffs, they have prayed this court to enjoin defendant from engaging in various types of conduct which plaintiffs contend are coercive to employees in the exercise of their organizational rights. Although the Teamsters have been dismissed as a plaintiff in this lawsuit, plaintiff Adams would once again be subject to defendant's policies if he decides to return to the company and plaintiff Lovett continues to be subject to any acts of defendant. Accordingly, these two plaintiffs have standing to seek the injunctive relief requested. It is true that the Teamsters' 1975 organizational drive ended unsuccessfully. See *Adams, supra,* at 324–325. However, this fact would not affect the propriety of granting injunctive relief to regulate defendant's conduct in any future representation efforts. Accordingly, plaintiffs' prayers for injunctive relief are not moot.

In reviewing the record as a whole, we have concluded that plaintiffs are entitled to some of the relief requested but are not entitled to all of it. We will first discuss those areas in which plaintiffs have not

made a sufficient showing that injunctive relief is necessary. We will then discuss those areas in which defendant must be enjoined.

■ A. Plaintiffs seek to have us enjoin defendant, through its agents, from threatening economic reprisals or financial ruin if a union is selected to represent the employees. Under the NRLA, an employer does not commit an unfair labor practice if he makes "a prediction as to the precise effects he believes unionization will have on his company" as long as the prediction is "carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969), *reh. denied*, 396 U.S. 869, 90 S.Ct. 35, 24 L.Ed.2d 123 (1969). We believe this standard should apply as well in determining whether management predictions are coercive under the Railway Labor Act.

■ As we indicated at the close of the 1975 hearings in this case, this court is convinced based on the testimony of Board Chairman Fred Smith that defendant was in a precarious financial situation during the Teamsters' 1975 organizational drive. The company was dependent on its investors to prevent it from going into bankruptcy, and Smith was concerned that a union would scare off these investors. We therefore find that defendant's statements about the negative effect of unionization on the company's financial status were made in good faith on the basis of the facts known to defendant at that time. Accordingly, we conclude that such statements were not coercive and hence we do not enjoin defendant from making similar predictions in the future as long as such predictions are based on fact. We point out, however, that defendant's economic picture may have changed since 1975, and any new predictions of what effect unionization would have must be based on defendant's current financial circumstances.

■ B. We find that there is evidence in the record to support the statements made by defendant in Exhibits 4, 6 and 7 that the Teamsters' organization attempt was attributable to a desire by defendant's competitors to harm the company. (Tr. 447–448, 487, 490, 493; Ex. 4, p. 2.) We do not intend to imply that the representation drive was *in fact* attributable to defendant's competitors, but rather we merely find that there was some factual basis for defendant's statements. Accordingly, we do not enjoin defendant from making such statements with regard to any future organizational attempt as long as there is sufficient factual basis for the statements.

■ C. Plaintiffs seek to have us enjoin defendant from interrogating its employees about union activities. It is not inherently coercive for management personnel to question employees about a union organizing campaign or to discuss such a campaign with them. Questioning of an employee by management only becomes coercive interrogation when its probable effect is to inhibit union activity. See *Larand Leisurelies, supra*, at 819. We find that the instances of questioning cited by plaintiffs in the record do not indicate that the employees questioned were coerced in violation of 45 U.S.C. § 152 (Third) and (Fourth). Rather, we find that almost all of these conversations were of a casual nature and that the employees questioned were not intimidated. Accordingly, we do not enjoin defendant from questioning its employees about union activities in the future so long as there is no hint of intimidation or reprisals in the conversations.

■ D. Plaintiffs pray that we enjoin defendant from engaging in surveillance of employees engaged in union activity. Plaintiffs have only pointed to one instance of alleged surveillance—that of an unidentified photographer taking pictures of union leafletting. (Tr. 406–410.) This evidence is insufficient to find that defendant has engaged in coercive surveillance, and hence an injunction against surveillance is not warranted.

■ E. Plaintiffs contend that defendants unlawfully conferred benefits on

its employees during the union campaign in order to undermine the organization effort. Plaintiffs specifically point to the institution of beer parties, an activities club and an incentive program in the hub. The Supreme Court has held that § 8(a)(1) of the NLRA prohibits an employer from engaging in "conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect." *NLRB v. Exchange Parts Co.,* 375 U.S. 405, 409, 84 S.Ct. 457, 460, 11 L.Ed.2d 435 (1964). We believe this standard is also appropriate to determine whether employees are "coerced" within the meaning of the Railway Labor Act by conferral of benefits on them. In this case, we find that instituting occasional beer parties and making membership in a recreational club available to employees are such insignificant acts that their effect on unionization would be minimal. Indeed, plaintiff Washington testified about the negligible effect of these activities on the organizing effort. (Tr. 355.) In addition, we find that the incentive program introduced in the hub was not designed to undermine the union, but rather was introduced for the legitimate business purpose of getting the aircraft loaded more promptly. Indeed, employee Thomas Patterson, a strong union supporter, testified that as many as 10 aircraft a night were departing significantly late before the incentive program was instituted. (Tr. 193.) Since none of these programs and activities coerced the employees in their selection of a bargaining representative, we do not enjoin such conduct by defendant in the future.

 F. Plaintiffs seek an injunction against defendant's solicitation of employee grievances during union organizational campaigns. It is clear that a grievance meeting was held between management and engine shop employees on March 10, 1975 which resulted in the immediate transfer of the engine shop manager, Larry Streiber. However, this was the only grievance meeting cited by plaintiffs during this period, and we find its purpose was primarily to cure a serious morale and quality problem in the engine room rather than to discourage union activity. (Tr. 443, 447.) Board Chairman Smith did acknowledge that part of the reason for calling the meeting was to discuss the sources of employee unrest that precipitated the union campaign. (Tr. 447.) This in and of itself does not make the grievance meeting coercive, however. We adopt the standard that it is permissible for an employer to solicit grievances during an organizational campaign unless "the grievance solicitation is accompanied by an express or implied promise to remedy the grievance if the Union is rejected, or if such promise otherwise serves as an inducement to vote against the Union." *Hedstrom Co. v. NLRB,* 558 F.2d 1137, 1142 n. 12 (3d Cir. 1977). We do not find any evidence that there was any promise to remedy employee grievances conditioned upon rejection of the union, nor do we find that this one grievance meeting had the effect of inducing employees not to vote for the union. Accordingly, we conclude that this grievance meeting was not coercive under the Railway Labor Act, and we decline to enjoin defendant from conducting such meetings in the future.

G. Plaintiffs request that we enjoin defendant from prohibiting employees from union soliciting during periods when they are not actually working. There is no evidence that defendant prohibited such activity, and thus no injunctive relief is required.

 H. Plaintiffs seek to have us find that defendant's treatment of K. B. Khan, a union supporter, was coercive. Khan is not a plaintiff to this lawsuit. However, if we concluded that defendant's conduct with respect to Khan was coercive, we could enjoin similar conduct by defendant in the future. The stories of Khan and Manager Worthington are diametrically opposed as to the circumstances of Khan's repudiation of his first affidavit and signing of his second affidavit. (Exs. 14, 15; Tr. 74–75, 937–944.) Weighing the evidence, we find that plaintiffs have not demonstrated that Khan was improperly coerced into signing the second

affidavit. Moreover, in view of the fact that Khan changed his story several times, we do not find the letter dated May 30, 1975 from James Riedmeyer to Khan threatening an investigation, possible perjury charges and possible termination unduly coercive. If this letter had been put up for public display, our view might be different. Counsel for plaintiffs alluded to the existence of a public notice of what would happen to Khan because of his statements, but there is no evidence to demonstrate that defendant ever made its statements to Khan public. (Tr. 971–973.) Accordingly, we find that defendant's actions concerning Khan's affidavits were not coercive and hence we decline to enjoin defendant from such conduct in the future should a similar situation arise.

I. Turning to areas in which we conclude that injunctive relief is warranted, it is clear from our findings and conclusions with respect to plaintiff Adams that an employee has been discharged in part for his union activities. Accordingly, we will enjoin defendant and its agents from either discharging or threatening to discharge any employees because of their involvement with unionization of defendant's employees.

J. It is further clear from our findings and conclusions with respect to plaintiff Lovett that defendant has unlawfully transferred an employee in part because of his union activities. Accordingly, we will enjoin defendant and its agents from either transferring or threatening to transfer any employees because of their involvement with unionization of defendant's employees.

K. It is clear from our findings and conclusions with respect to plaintiff Adams that defendant has unlawfully ordered the removal of union buttons. There is further evidence that defendant has created some confusion as to whether employees are permitted to wear union jackets. (Tr. 172–181, 750–752, 771–778.) As we previously stated, employees must be permitted to wear union insignia unless there is a strong reason for requiring their removal unrelated to anti-union animus on the part of the employer. *Larand Leisure-*

*lies, supra,* at 819. There was much testimony in this case that buttons might cause foreign object damage to the aircraft, but the testimony indicated that other types of loose objects were permitted in the vicinity of the aircraft. (Tr. 779–782.) Accordingly, we will enjoin defendant and its agents from ordering the removal of union insignia, including jackets and buttons, unless there is a compelling reason for prohibiting such insignia. Even if defendant provides such a compelling reason, any ban must be uniformly enforced irrespective of the particular message sought to be displayed. Moreover, any reason given for banning such insignia will be carefully scrutinized to determine whether it is merely a pretext for stifling expressions of union support. The mere fact that union insignia may create hostility between different employees or between employees and management is not a sufficient reason to justify a ban on insignia.

L. Plaintiffs seek to have this court enjoin defendant from stating that it is not permitted to implement planned benefits during an organizational campaign. Plaintiffs refer in particular to a letter to employees from Senior Vice President Michael Fitzgerald which stated that a new wage plan and other programs which had been decided upon could not be implemented "simply because it is against the law for us to proceed with these programs during an organizational attempt." (Ex. 5.) As we have already noted, it is sometimes considered coercive for an employer to confer benefits on employees during an organization campaign. See *Exchange Parts, supra.* Nevertheless, it is also considered coercive if an employer threatens to withhold benefits already agreed upon in the face of an organization effort. See *Sta-Hi Division, Sun Chemical Corporation v. NLRB,* 560 F.2d 470, 473–475 (1st Cir. 1977); *NRLB v. Juniata Packing Company,* 464 F.2d 153, 154 (3d Cir. 1972); *NLRB v. Dothan Eagle, Inc.,* 434 F.2d 93, 97–98 (5th Cir. 1970). Courts have noted that this is a fine line which can cause problems for an employer. However, the guiding principle is that the

employer must act as he would in the absence of a union campaign. *Sta-Hi, supra,* at 474. As the U. S. Court of Appeals for the Fifth Circuit has stated:

> The cases make it crystal clear that the vice involved in both the unlawful increase situation and the unlawful refusal to increase situation is that the employer has *changed* the existing conditions of employment. It is this *change* which is prohibited . . . .

*Dothan Eagle, supra,* at 98 (emphasis in original). Since the Fitzgerald letter falsely stated that defendant would be required to withhold impending benefits during the union campaign, we conclude that this statement was coercive in violation of the Railway Labor Act. Accordingly, we will enjoin defendant and its agents from making any statements during any future union campaign to the effect that defendant is prevented from granting any impending benefits during the course of such campaign.

█ M. There is unrefuted evidence that Senior Vice President Fitzgerald advised employee Thomas Patterson not to wear his union jacket because he might be violently attacked. (Tr. 180, 772–773.) We conclude that such statements are coercive. Accordingly, we will enjoin defendant and its agents from making any statements that suggest employees may suffer physical harm for supporting a union organizing effort.

N. Given the extent of defendant's violations of the Railway Labor Act outlined in this opinion, we further enjoin defendant and its agents from coercing, interfering with or influencing its employees in any way with respect to their right to choose a bargaining representative under 45 U.S.C. § 152 (Third) and (Fourth).

O. Defendant is hereby ORDERED to post copies of this decision at all places on defendant's premises normally used to communicate with employees.

### VI. *Conclusion*

█ For the foregoing reasons, defendant will be enjoined from committing violations of the Railway Labor Act as set out in detail in Section V of this decision. Plaintiffs Larry Washington and George Andrews are entitled to no relief. Plaintiff Charles Adams is entitled to be reinstated to the position he held at the time he was discharged with full seniority rights and back pay. Plaintiff Billy Lovett is entitled to the full department seniority he would have had if he had not been transferred in March of 1975 and any back pay which he lost as a result of the transfer. In each of these cases, the amount of back pay is to be offset by the income of the particular plaintiff since the time of the discharge or transfer. Plaintiff Lovett, in particular, may have difficulty demonstrating that he lost any pay at all in view of his transfer to a well-paying position. Furthermore, the amount of back pay is to be computed *without* interest, since much of the delay in this case resulted from plaintiffs' unsuccessful appeal of this court's order of September 10, 1975. Counsel will prepare and submit a decree forthwith other than as to back pay.

Counsel are hereby given 60 days in which to reach a mutually satisfactory agreement as to the amount of back pay owing to plaintiffs Adams and Lovett. If no agreement can be reached within 60 days, the question of back pay will be referred to a Magistrate for resolution.

The Clerk is directed to withhold judgment in this case until the amount of back pay is determined.

It is so ORDERED.

### ORDER DENYING MOTION TO ALTER OR AMEND JUDGMENT

Defendant has moved this court to alter or amend our decision of April 26, 1979 in which we determined that plaintiffs Charles Adams and Billy Lovett were entitled to individual and injunctive relief under the provisions of § 2 (Third) and (Fourth) of the Railway Labor Act, 45 U.S.C. § 152 (Third) and (Fourth).

█ First, defendant challenges this court's conclusion that plaintiff Adams' dis-

charge for failing to remove his Teamster button was unlawful. Defendant contends that this court misinterpreted the Sixth Circuit's opinion in *Larand Leisurelies, Inc. v. NLRB*, 523 F.2d 814 (6th Cir. 1975). In that case, interpreting §§ 8(a)(1) and 8(a)(3) of the National Labor Relations Act (NLRA), 29 U.S.C. § 158(a)(1) and (3), the Sixth Circuit held that employees must be permitted to wear union insignia unless there are "special considerations relating to employee efficiency and plant discipline." *Id.*, at 819. We found that no such special considerations were present, and nothing in defendant's current motion or memorandum convinces us otherwise. Not only was there no evidence whatever to show that the button adversely affected efficiency or discipline, but the evidence instead demonstrated that Vice President Tucker Taylor ordered Adams to remove his button because Taylor felt it would be offensive to defendant's bankers who were visiting the plant that day. It does appear that defendant was in grave financial trouble at that time, and that, if the bankers on the premises had learned that the Teamsters Union was seeking to organize defendant's employees, this might well have tipped the scale and caused them to foreclose or call their loans. This would indeed have been a tragedy, not only for defendant's employees but also for the entire Memphis community. This is, however, only an extreme example of a position often taken by employers—i. e. that a union would be bad for their businesses and employees. We do not understand that such a contention, even if demonstrably true, is a legitimate basis for proscribing the wearing of union insignia under the doctrine of *Larand Leisurelies, Inc., supra.*

Defendant next contends that we improperly concluded plaintiff Billy Lovett was entitled to full department seniority and any lost back pay as a result of his unlawful transfer from the Maintenance to the Training Department. Defendant argues that Lovett can only complain, if at all, about the period between March 10, 1975 through April 28, 1975 before he voluntarily left defendant to enter the Air Force. According to defendant, any time that Lovett

spent in the Training Department after being discharged from the Air Force was the result of a new agreement between Lovett and defendant, and hence was not the result of any unlawful transfer. This argument completely ignores the fact that, if the unlawful transfer had not occurred, Lovett would have been entitled to be reinstated to his position in the Maintenance Department under the Veterans Re-Employment Rights Act, 38 U.S.C. § 2021 et seq. As it was, since Lovett was in the Training Department immediately before going into the service, his only option upon return to defendant was to remain in the Training Department. The fact that he had to return to the Training Department rather than the Maintenance Department because of defendant's unlawful practices certainly cannot be held against him.

Defendant next contends that we applied the wrong test for determining whether a discharge or transfer is "coercive" within the meaning of the Railway Labor Act. We applied the rule announced in *Conrad v. Delta Airlines, Inc.*, 494 F.2d 914, 918 (7th Cir. 1974), in which the Seventh Circuit stated: "Anti-union motivation invalidates a discharge which could be justified on independent grounds." Defendant argues that this rule is inconsistent with decisions of the Supreme Court and other circuits, which purportedly hold that a discharge is lawful if the employer states some valid reason for it regardless of whether the discharge is partially motivated by anti-union sentiment.

At the outset, the result would be the same here even if we agreed with defendant that we applied the wrong test. It is clear from the findings of this court that plaintiff Adams was discharged for wearing his union button and plaintiff Lovett was transferred to get him out of the Maintenance Department because of his union activity. We did not find any valid explanation for either action. Thus, Adams and Lovett would be entitled to relief even under the test suggested by defendant.

Apart from that, however, defendant has completely misrepresented the cases on

which it relies. Defendant states that the Supreme Court has set out a four-part test which must be met for a discharge to violate § 8(a)(1) of the NLRA. *NLRB v. Burnup & Sims, Inc.*, 379 U.S. 21, 23, 85 S.Ct. 121, 13 L.Ed.2d 1 (1964). However, the Supreme Court merely stated that a violation occurred if those four elements were present. The court did not say that each of those elements was necessary for a violation of § 8(a)(1). Indeed it is obvious from looking at the four elements that they cannot apply to every discharge situation. For example, if an employer discharged an employee expressly for union activities without any pretext of misconduct on the part of the employee, the *Burnup & Sims* test would not be satisfied. Yet that would be a clearer violation of § 8(a)(1) than a situation in which the employer attempts to advance a legitimate reason for the discharge. The other two Supreme Court cases cited by defendant have absolutely nothing to do with labor relations and have no bearing on judicial interpretations of the requirements of the federal labor laws. The Sixth Circuit case cited by defendant, *NLRB v. Cleveland Pressed Productions Corporation*, 493 F.2d 1250 (6th Cir. 1974), does not stand for the proposition, as defendant contends, that a discharge partially caused by anti-union animus is lawful if based on some other valid reason. Rather, the Sixth Circuit in that case found that an employee's discharge was simply not caused *at all* by his union activities despite some evidence of anti-union animus by the employer. Finally, defendant relies on the interpretation of the Railway Labor Act in *United States v. Winston*, 558 F.2d 105 (2d Cir. 1977). However, *Winston* involved a *criminal* prosecution of employers for unlawful coercion under the Railway Labor Act. The Second Circuit made it clear that it was applying a different standard to determine "coercion" for purposes of the criminal prosecution than it would in a civil action. *Id.*, at 109. In sum, we reaffirm our use of the *Conrad* standard in determining whether a discharge or transfer is unlawfully coercive under the Railway Labor Act.

Finally, defendant contends that the injunctive relief granted is unjustified because any violations were isolated incidents and because of the passage of time since the violations occurred without further unlawful activity. Defendant quotes our order of September 10, 1975, denying plaintiff's application for a preliminary injunction, in which we stated that defendant was not "engaged in any conscious concerted attempt" to violate the Railway Labor Act and further stated that defendant did not have "a practice of discharging employees that were union advocates." These statements remain accurate, and are not contradicted by our ultimate decision in this case. The fact that Adams and Lovett were dealt with unlawfully and that defendant committed a number of other violations does not mean that defendant was making a concerted effort to violate the Act or had a consistent practice of getting rid of pro-union employees. Nevertheless, defendant's unlawful activity may well have had the effect of discouraging other employees from exercising their statutory rights. The fact that numerous employees may have been chilled by defendant's conduct requires the injunctive relief set out in our decision. Moreover, defendant cannot rely on the fact that there is no present union organizational drive or that no violations of the Railway Labor Act have occurred since 1975. It could well be that there would have been more interest in union activity if not for defendant's prior unlawful actions.

Defendant continues to urge that cases under the NLRA have little application to the Railway Labor Act. While we agree that the NLRA cases are not controlling, it would make little sense to define coercion of employees under the Railway Labor Act in a substantially different way than under the NLRA.

For the foregoing reasons, we find no merit in any of defendant's contentions. Accordingly, defendant's motion to amend our previous decision is hereby DENIED.

It is so ORDERED.